UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
SECURITIES AND EXCHANGE COMMISSION,       )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        Case No. 19-CV-11416 (WGY)
                                          )
HENRY B. SARGENT,                         )
                    Defendant.            )
_____ )

## PARTIES' PRETRIAL MEMORANDUM

The Securities and Exchange Commission (the "Commission") and defendant Henry Sargent respectfully submit the following pretrial memorandum pursuant to Local Rule 16.5(d).

## I.      Concise Summary of the Evidence that will be offered by:

### a.  Plaintiff

The Commission alleges that Sargent, a seasoned securities lawyer, engaged in a scheme to defraud and/or made material misstatements in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder by concealing the fact that the supposed independent shareholders of Sargent's entity—BMP Holdings, Inc. ("BMP")—were, in fact, mostly just friends, family, co-workers, and people they recruited, who had agreed to be identified as BMP shareholders.  This created the appearance that BMP met certain minimum shareholder requirements to be publicly traded.  Further, the BMP shareholder base made BMP a more attractive investment to third parties by making it seem as if these shareholders were unaffiliated with BMP (or Sargent) and, therefore, supposedly held shares that could be freely sold into the marketplace if acquired.

After BMP, at Sargent's direction, filed a public statement with the Commission registering the sale of stock in the names of the above-referenced shareholders (hereinafter referred to as the "record shareholders"), Sargent sold control of BMP to PixarBio Corporation ("PixarBio"), which merged the two entities in order to make those BMP shares tradeable to the public as shares in PixarBio.  At the same time that Sargent sold BMP to PixarBio, Sargent arranged to consolidate all of the shares held in the names of the record shareholders to himself and two other individuals, M. Jay Herod and Patrick Giordano, each of whom were connected to PixarBio's CEO.  Sargent, Herod, and Giordano subsequently distributed those shares into the marketplace before the Commission suspended trading in PixarBio's stock.  The Commission further alleges that these sales violated Section 5(a) and 5(c) of the Securities Act.  Various details concerning what the Commission intends to prove are set forth below.

## BMP: Background

Henry Sargent is an attorney, a chartered financial analyst, and is employed by Southridge Capital Management, a financial services company located in New York, New York, and Ridgefield, Connecticut.  According to BMP's regulatory filings, Buddhi Mat LLC ("Buddhi Mat") was formed in Connecticut in June 2009 and with Sargent as the company's sole owner.  Buddhi Mat owned a yoga studio located in Ridgefield, Connecticut, that consistently operated at a loss, including a net loss of $130,000 for 2013 and 2014.

On August 4, 2014, BMP was incorporated in Delaware.  Henry Sargent was BMP's CEO, CFO, and sole director.  BMP was a shell company in that it had no assets—as the name reflected, it was a "holding" company that would eventually acquire Buddhi Mat, as described below.

Between September and December 2014, BMP issued 168,000 shares in a private offering to 32 record shareholders.  The record shareholders included members of Sargent's family, personal

friends, business contacts, and employees of Southridge, along with referrals and family members of those shareholders.[1]  Sargent provided the record shareholders no written materials regarding BMP's operations, financial statements, or development plans.  Many record shareholders were unaware of what BMP was, whether it conducted any business, or what Sargent's intentions were for the company.

On January 1, 2015, Sargent contributed his membership interest in Buddhi Mat to BMP in exchange for 5 million restricted shares of restricted BMP stock.  Sargent never informed the record shareholders nor did they ever consent to Sargent issuing these shares to himself (nor were they aware of, nor did they consent to, Sargent's later decision to issue another 245 million shares to himself for tax reasons, the effect of which was to dilute their ownership of the company from 100% to a tiny fraction of one percent.)

### BMP-PixarBio Transaction: Background

From January 2015 through August 2016, Joseph Tomasek, Esq., performed legal work for BMP.  He entered a legal services agreement with BMP on April 25, 2015.  BMP paid Tomasek $5,000 in January 2015; $5,000 in May 2015; and $25,000 in August 2016.  Throughout, Tomasek acted at Sargent's direction.

On May 11, 2015, BMP filed a Form S-1 registration statement with the Commission.  The stated purpose of the Form S-1 was to register the above-described record shareholders' sale of 168,000 shares of BMP common stock.  BMP filed a third amendment to the Form S-1 on August 4, 2015.  The Commission issued a Notice of Effectiveness on August 12, 2015.  Sargent, however,

---

[1] The chart in Section II below summarizes the following: the names of the shareholders, number of shares BMP issued in each shareholder's name, the amount of money each shareholder gave to BMP, the price per share, the date of the subscription agreement, the date of each shareholder's check provided with the purchase agreement, and the individual or entity to whom the check was made payable.

never told any of the record shareholders that BMP filed the Form S-1 or that their stock was registered for sale.

At Sargent's request, on or about September 22, 2015, a brokerage firm (Alpine Securities) submitted a Form 211 application to the Financial Industry Regulatory Authority ("FINRA") on behalf of BMP.  On January 21, 2016, FINRA issued a stock symbol ("BMPP") for BMP, clearing BMP stock to be quoted on the OTC markets.  Again, Sargent did not tell any of the record shareholders that they could now sell their stock on the OTC Markets.  Instead, beginning in approximately March 2016, Sargent and Tomasek began discussing the possibility of selling BMP.  Ultimately, a Massachusetts biotechnology company, PixarBio, purchased BMP under terms described below.  Patrick Giordano was involved in the negotiation of the sale on behalf of PixarBio and its CEO.

As a central component of the BMP-PixarBio transaction, Sargent arranged to consolidate and sell all of the record shareholders' stock to himself, Giordano, and Herod, who had agreed to obtain and sell that stock into the market (illegally) on PixarBio's CEO's behalf.[2]  The record shareholders' stock accounted for the only BMP shares that were purportedly unrestricted (*i.e.*, could be sold without limitation) into the marketplace.  Those shares were consolidated—and became a centerpiece of the BMP-PixarBio negotiations.

### BMP-PixarBio Transaction: Transfer of Record Shareholders' BMP Stock

As part of the preliminary discussions between PixarBio (at the time by Giordano) and BMP (at the time by Tomasek), in late May 2016, Giordano inquired whether BMP could have a record shareholder deposit shares with the Depository Trust Corporation ("DTC") in order to facilitate

---

[2] *See SEC v. PixarBio Corp.*, 18-cv-01797-WGY (D. Mass. April 24, 2018); *United States v. Reynolds*, 18-cr-10154-DPW (D. Mass. April 18, 2018).

electronic trading in BMP stock.  Doing so would make BMP a more attractive target for PixarBio.

Tomasek relayed this request to Sargent, who responded that he was already working on it.  On June

6, 2016, Sargent caused BMP to enter a DTC Services Contract with Alpine Securities.  Among

other things, BMP contracted with Alpine Securities to act as BMP's agent with DTC.

By assignment agreements dated June 20, 2016, three BMP record shareholders assigned

their shares to shareholder Bodhnarine Persaud ("Persaud"), a Southridge employee. According to

the terms of the agreements, Sabrina Persaud (Persaud's wife) assigned 5,000 BMP shares to

Persaud for $100 ($0.02 per share); Richard Persaud (Persaud's son) assigned 5,000 BMP shares to

Persaud for $100 ($0.02 per share); and Eloise "Linda" Carlsen (an administrative assistant at

Southridge) assigned 3,000 BMP shares to him for $100 ($0.03 per share).  Together with the 5,000

BMP shares Persaud already held in his name, after the assignments Persaud held 18,000 BMP

shares.

On June 30, 2016, Persaud deposited 18,000 shares of BMP stock with Alpine Securities, the

same brokerage firm where BMP had signed its DTC Services Contract.  In or around July 2016,

Persaud requested that Alpine Securities deposit those 18,000 shares of BMP stock with the DTC.

As the negotiations to sell BMP to PixarBio got closer to agreement, beginning in or around

July 11, 2016, Sargent sent blank stock powers to other BMP record shareholders to arrange for the

sale of their shares at Sargent's direction.  Many of the record shareholders sent the stock powers

back to Sargent without the purchaser (or assignee) identified (enabling Sargent to sell the shares to

anyone), and without any of the record shareholders negotiating with or even speaking to any

potential purchaser of their shares.

In or around July and August 2016, Sargent negotiated a letter of intent to sell his restricted

BMP stock to PixarBio and agreed to deliver and facilitated the delivery of shares in the names of

the record shareholders to persons chosen by PixarBio's CEO.  Specifically, in and around August 2016, the 25 remaining BMP shareholders transferred 130,000 BMP shares in their names to Herod for a total of $2,600 ($0.02 per share each).  Sargent facilitated these transfers.  In fact, Tomasek represented on Sargent's behalf during the course of negotiating the above-referenced transfers that the shareholders were "friendly" and that Sargent would facilitate the transfer of their shares.

Also in August, shortly after speaking by telephone with Sargent, Giordano executed stock assignment agreements dated August 15, 2016, with record shareholders Cynthia Bishop and Jason Bishop to purchase all 10,000 of their shares for a total of $200—$100 for Cynthia Bishop's 5,000 shares ($.02 per share) and $100 for Jason Bishop's 5,000 shares ($.02 per share).

Sargent also negotiated to retain some of the record shareholders' shares himself.  By assignment agreement dated August 15, 2016, Carolyn Sargent (Henry Sargent's sister) transferred 10,000 BMP shares in her name to Henry Sargent for $1,000 ($0.10 per share).  Thereafter, with a check deposited on September 23, 2016, and an assignment agreement dated September 30, 2016, Bodhnarine Persaud transferred the 18,000 shares in his name to Henry Sargent for $2,000 (about $0.11 per share).

By August and September of 2016, all BMP shares previously held by the 32 record shareholders described above were transferred to three individuals—Herod, Sargent, and Giordano. Several of the 32 shareholders did not know that their stock was sold until afterwards, and Sargent did not discuss the terms of the BMP-PixarBio transaction with them such that they could have made an informed decision about when, or whether, to sale their shares.

Between July and September 2016, Sargent made additional payments by check to certain of the record shareholders.  For example, Sargent paid record shareholder Thomas Saunders $1,000 (despite the fact that Saunders only received $100 for his shares) to thank him for the favor he

provided; *i.e.*, holding stock for Sargent and asking his (Saunders's) family do the same until Sargent directed them to dispose of their shares.  Similarly, Sargent paid Conrad Huss $500 (despite the fact that Huss only received $100 for his shares) to thank Huss for holding and selling the stock and recruiting six other shareholders to do the same.  These additional payments are summarized below:

| Name | Amount of Payment | Date of check |
|---|---|---|
| Conrad Huss | $500 | 09-13-2016 |
| Robert Gyemant | $150 | 08-01-2016 |
| Daniel Griffin | $150 | 08-10-2016 |
| Scott Adams | $150 | 08-01-2016 |
| Benjamin Delgado | $150 | 08-01-2016 |
| Thomas Saunders | $1,000 | 08-18-2016 |
| Steve Saunders | $150 | 07-15-2016 |
| Mary Saunders | $150 | 07-15-2016 |
| Carol McCahon | $150 | 07-15-2016 |
| Dennis McCahon | $150 | 07-15-2016 |
| Erica Evans | $150 | 07-15-2016 |
| Jerry Evans | $150 | 07-15-2016 |
| Elizabeth Reed | $150 | 07-15-2016 |
| Kelly Reed | $150 | 07-15-2016 |
| Lidia Santos | $150 | 08-18-2016 |
| Claire Bacon | $150 | 07-13-2016 |
| Cynthia Bishop | $500 | 07-29-2016 |
| Jason Bishop | $500 | 07-29-2016 |
| James Girolamo | $500 | 08-13-2016 |
| Lynn Girolamo | $500 | 08-13-2016 |
| Linda Carlsen | $300 | 09-13-2016 |
| Jonathan Hicks | $150 | 07-28-2016 |
| Taylor Hicks | $150 | 07-28-2016 |

**BMP-PixarBio Transaction: Restricted Shares and Buddhi Mat**

At the same time that Sargent facilitated the consolidation of all BMP's purportedly free-trading shares, Sargent and PixarBio executed a stock purchase agreement on or about August 18, 2016.  Pursuant to the agreement:

1. PixarBio paid $108,500 to Sargent for 5 million restricted shares in Sargent's name and paid $216,500 to BMP as a capital contribution to pay off BMP's outstanding debt.  BMP in turn paid $191,500 to Sargent and $25,000 to Tomasek.

2. Sargent entered a management agreement with PixarBio to manage Buddhi Mat (the company that owned yoga studio).  Sargent also maintained an option to purchase Buddhi Mat LLC.

3. Sargent also agreed to deliver "lock-up" agreements with the holders of 25,000 shares of BMP stock, whereby those holders would agree not to sell, assign, or otherwise transfer their stock for six months.

By "lock-up" agreements dated August 18, 2016, Sargent agreed to lock-up the 10,000 shares he had acquired from his sister; and Persaud, as Sargent agreed he would in the stock purchase agreement, agreed to lock-up 18,000 shares in his name, both for a period of six months.  As part of the stock purchase agreement between PixarBio and BMP, Sargent also resigned from certain executive positions of BMP, but remained president of BMP and one of two members of BMP's board of directors until at least in or around the middle of September 2016.

In and around August 12 and 19, 2016, and as required by the letter of intent and stock purchase agreement between Sargent and PixarBio, Sargent cancelled the additional 245 million restricted shares he had issued in his name for tax purposes.  Subsequently, in and around October and November 2016, PixarBio cancelled all restricted shares it had acquired from Sargent through the stock purchase agreement.  And, in December 2016, Sargent purchased Buddhi Mat back from PixarBio for $100 plus Sargent's agreement to assume all Buddhi Mat debt and liabilities.  Consequently, PixarBio did not retain Sargent's restricted shares or Buddhi Mat; instead, the value

in the deal was Reynold's access to the purportedly unrestricted shares transferred to Herod's name, which Sargent consolidated and delivered.

### Sargent's, Herod's, and Giordano's Sale of BMP Stock into the Market

On October 11, 2016, PixarBio issued a press release announcing a 9 for 1 stock dividend of all issued and outstanding shares, which had the effect of multiplying all outstanding shares by 10 included all BMP shares transferred in August and September 2016.  On October 30, 2016, PixarBio issued a press release announcing the finalization of its merger with BMP, the renaming of BMP to PixarBio, and that PixarBio stock would trade on the public stock market the next day.

As a result of the stock split and merger, the BMP shares assigned to Sargent, Giordano, and Herod became shares of PixarBio, and the total number of shares in their names increased from 168,000 shares to 1,680,000 shares—280,000 owned by Sargent, 100,000 owned by Giordano, and 1,300,000 owned by Herod.

From October 31, 2016, through January 20, 2017, Herod sold 205,283 shares (net) of PixarBio for net proceeds of $891,313. Herod paid $500,000 of those proceeds back to PixarBio and $300,000 directly to PixarBio's CEO.  As part of Herod's criminal case, he pled guilty to lying to the SEC about the payment to PixarBio's CEO.[3]

Herod was the only person to sell PixarBio stock on the public markets on October 31 and November 1, 2016 (except for a small number of shares resold by public investors who purchased from Herod on October 31).  Herod did not make any public trades from November 2 until again on November 23, 2016, because the brokerage firm he used on the first two days would no longer trade

---

[3] Herod's sale figures here are "net" because, as he pled guilty to in the parallel criminal case, Herod periodically placed small buy orders at the PixarBio CEO's direction in an effort to further manipulate the public market for PixarBio stock.

for him.  The delay in trading was because it took Herod three weeks to deposit his shares at a different broker.

When PixarBio shares initially began trading, Sargent's shares (including those he had acquired from Persaud) were subject to lock-up agreements with PixarBio.  After speaking by phone on November 2, 2016, PixarBio CEO emailed Sargent a Termination of Lockup Agreement with a cover email that included the message, "Congrats on picking good partners[.]"  The termination agreement among other terms (a) referenced PixarBio's request that Sargent enter a lock up agreement in connection with the August stock purchase agreement and (b) released Sargent from any further selling restrictions.  Sargent's first sale of PixarBio shares occurred on November 3, 2016.  From November 3, 2016, through January 18, 2017, Sargent sold 109,187 shares of PixarBio for a total of $630,979.  From November 17, 2016, to January 18, 2017, Giordano sold 27,700 shares of PixarBio for a total of $116,957.

On January 23, 2017, the Commission suspended public trading in PixarBio stock pursuant to Section 12(k) of the Exchange Act [15 U.S.C. §78l(k)].

The shares of common stock of BMP and PixarBio constitute "securities" for purposes of Section 3(a)(10) of the Exchange Act of 1934 [15 U.S.C. §78c(a)(10)] and Section 2(a)(1) of the Securities Act of 1933 [15 U.S.C. §77b(a)(1)].  Sargent used means or instruments of transportation or communication in interstate commerce to sell securities.  No registration statement was in effect for the sale of Sargent's, Herod's, or Giordano's securities.

The Commission intends to prove the foregoing through documentary exhibits and witnesses. The exhibits generally fall into the following categories: (a) subscription agreements between BMP and record shareholders; (b) public records and organizational documents of BMP and/or PixarBio; (c) bank records and summaries thereof reflecting various relevant monetary transfers associated

with the movement of BMP shares; (d) stock assignments reflecting the transfer of various BMP

shares; (e) brokerage and transfer agent records and summaries thereof reflecting the transfer of the

BMP shares and their subsequent public market sales after they became stock of PixarBio; and

(f) emails involving Sargent and others concerning PixarBio's acquisition of BMP, and the

contemporaneous acquisition of the record shareholders' BMP stock by Sargent, Herod, and

Giordano.

    As set forth below, the Commission has identified a number of witnesses that it intends to

call in its case-in-chief.  A brief summary of each witness's relevance is set forth below:

- **Scott Adams, Claire Bacon, Cynthia Bishop, Eloise Carlsen, Benjamin Delgado, James Girolamo, Dennis Griffin, Jonathan Hicks, Taylor Hicks, James Riley,** and **Carolyn Sargent** were each record shareholders, and are expected to testify about the nature of their investments in BMP.

- **Conrad Huss, Bodhnarine Persaud**, and **Thomas Saunders** were each also record shareholders, are expected to testify about the nature of their investments in BMP.[4]  Huss, Persaud, and Saunders also recruited other individuals to serve as BMP's record shareholders and are expected to testify about that process.  Persaud will also testify about his consolidation of shares with three other shareholders and subsequent deposit of those shares with a brokerage firm to allow for electronic deposit and trading of BMP stock.

---

[4] Huss resides out of state.  According to Huss's attorney, Huss suffers from serious medical issues that would preclude his ability to travel to testify.  The parties may seek leave from the Court to either (a) elicit Huss's trial testimony remotely (via Zoom), or (b) declare Huss unavailable, and introduce designations from his deposition testimony instead.

Persaud resides in Canada and is outside the reach of the parties' subpoena power.  At this time, the parties do not know whether Persaud will voluntarily travel to the United States to testify.  Given that uncertainty, the parties have designated parts of Persaud's deposition in the event he's deemed unavailable.

- **Patrick Giordano** is a former defendant in this case. He is expected to testify about his role in brokering and knowledge of the PixarBio-BMP transaction, and his receipt and subsequent sale of BMP stock as part of that transaction.

- **M. Jay Herod** is a former defendant in a related case, SEC v. PixarBio Corp. et al., Case No. 18-cv-10797-WGY (filed April 24, 2018). Herod, who was a close friend of PixarBio's CEO, received the majority (nearly 80%) of the record shareholders' BMP stock at or about the time the PixarBio-BMP transaction was consummated. Herod also pled guilty in a related criminal case for manipulating the public market at the direction of PixarBio's CEO and for obstructing the SEC's investigation, *United States v. Reynolds*, Case No. 18-cr-10154-DPW, and is expected to testify about his role in the scheme.

- **Robert Tew** worked for Alpine Securities during the relevant period. Alpine Securities worked with BMP to enable it to list its stock for trading on the OTC Securities Markets and when Persaud deposited his stock to enable electronic trading. Tew is expected to testify about those processes.

- **Joseph Tomasek, Esq.,** is a former defendant in this case, and was retained by Sargent on behalf of BMP to prepare BMP's Form S-1 and to negotiate the BMP-PixarBio transaction.

- **Robert Robbins, Esq.,** is an expert who is expected to testify, pursuant to Fed. R. Evid. 702, about the purpose and background of Section 5 of the Securities Act in connection with the question of whether the sale of shares by Sargent, Giordano, and Herod was an unregistered distribution.

- **Ryan Murphy** is a summary witness pursuant to Fed. R. Evid. 1006 and is expected to summarize various voluminous records concerning BMP, BMP's shareholders, and/or PixarBio.

- **Henry Sargent** is the defendant in this case.  He is expected to testify about his experience as a securities lawyer, including by serving as in-house counsel for Southridge Capital, an investment firm.  Sargent is also expected to testify about the BMP-PixarBio transaction.

**b.  Defendant**

Sargent is a manager at Southridge Capital, a family investment office based in Connecticut. In his professional career, Sargent has focused almost exclusively on financings involving public companies.

In 2009, Sargent decided to build a side business based on his passion for yoga.  He opened a small private yoga studio in Ridgefield, Connecticut called Buddhi Mat LLC ("Buddhi Mat"). Sargent dedicated ten to fifteen hours per week to developing and operating Buddhi Mat.  Sargent employed approximately ten yoga instructors to work at Buddhi Mat, including one who held a dual role as its manager.  By 2014, Buddhi Mat offered approximately 20 yoga classes per week and operated a small retail shop.  It was a vibrant, but money-losing operation.  From 2009 through 2014, Sargent invested several hundreds of thousands of dollars to build, operate and expand the business. From the inception of the operation of Buddhi Matt until January 2015, Sargent made contributions of working capital and loans well in excess of $200,000.  Additionally, from January 2015 through the sale of Sargent's shares on August 19, 2016, Sargent provided working capital to BMP in the form of loans in the amount of $191,500.

In 2014, Sargent began to look for investors and financing opportunities for the studio and to alleviate his own financial burden.  In addition to considering bringing in private investors, Sargent also considered taking Buddhi Mat public in order to help attract professional or institutional investors with whom Sargent was familiar through his professional employment.  Sargent's business plan contemplated expanding the business into new neighborhoods and essentially creating a small

chain of yoga studios with a heightened profile.  On August 4, 2014, Sargent formed and incorporated BMP.

After forming BMP, Sargent, as the first step of a multi-step process to raise funding, either publicly or privately, for the expansion of the studio business, began to reach out to people he knew, including family, friends, and business associates, to explain the investment opportunity and possibilities for the business.  Understanding that Sargent was presenting a low-cost, low-risk, and potentially modest-gain opportunity, a number of those approached or who learned of the opportunity invested.  Between September and December 2014, 32 shareholders subscribed for and purchased shares as investors in BMP.  On January 1, 2015, Sargent contributed Buddhi Mat to BMP in exchange for shares in BMP.

Four of the 32 Shareholders had personal relationships with Sargent, including his sister, his mother, a long-time friend, and the friend's wife.  Seven other Shareholders were people with whom Sargent had working, but not personal, relationships.  The remaining twenty-one Shareholders had no relationship of any nature with Sargent and, in fact, had never communicated with Sargent.  Not a single Shareholder testified that he or she had any agreement with Sargent about buying or selling their shares and each testifying Shareholder rejected the SEC's notion that Sargent dictated any of the decisions in that regard or exercised any control over him or her.

On April 25, 2015, Sargent, on behalf of BMP and himself, personally, retained Joseph Tomasek, of counsel to The Mintz Fraade Law Firm, P.C. ("Mintz & Fraade"), to work with BMP's auditor and to file BMP's S-1 Registration Statement.  The SEC declared BMP's registration effective on August 12, 2015.

The Shareholders understood that BMP was going public and understood the opportunity presented. The S-1 registration statement provided a mechanism by which the S-1 shareholders could sell or dispose of their shares, if they chose.

In or about late June 2016, Tomasek and Sargent began to discuss selling BMP. Several transaction partners were considered by Sargent and Tomasek before a transaction with PixarBio was even mentioned. Tomasek did not even hear the name PixarBio or any of the people associated with PixarBio until mid-July 2016, and Sargent learned of PixarBio at some later time. PixarBio likewise considered several other parties for a transaction before even considering BMP.

Finally, and following extensive negotiations, on August 18, 2016, PixarBio and Sargent entered into a stock purchase agreement for the purchase of 5,000,000 shares of BMP common stock. BMP received $216,500, of which $191,500 was utilized to satisfy an outstanding loan made by Sargent to the Company and $25,000 was used to pay Tomasek's legal fees. Sargent received approximately $.02 per share for his holdings, the exact amount that the S-1 Shareholders eventually received.

Contrary to the contention that Sargent had control over the S-1 Shares and helped to consolidate 100% of the shares, not a single Shareholder provided testimony that supports the SEC's contention, and, to the contrary, the Shareholders each testified that he or she knew that BMP was undergoing the process of going public, that BMP had obtained a trading symbol, and that shares could be traded in the public market, and further testified that they made independent decisions about when and how to dispose of their shares.

The Shareholders doubled their money when they chose to sell their shares privately.

The SEC argues that (1) there was something untoward about the S-1 because it did not include Sargent's shares and (2) Sargent's sale of Shares that he had purchased from an S-1

Shareholder in the public market following the PixarBio acquisition violated securities laws. The SEC's arguments fail. At the time of the S-1 filing, Sargent was the control person of BMP and, as holder of the control block and the sole officer and director of BMP, his shares were restricted. For that reason and because his plan was to fund and expand the yoga studio business, Sargent had no intention to sell any part of his holdings; hence, there would have been no basis or reason to include his shares in the S-1. By the time Sargent sold shares one and one-half years later, Sargent, as of August 19, 2016, no longer owned his control block of shares and had resigned as an officer and director of BMP. Rather, Sargent held 10,000 shares purchased from an S-1 Shareholder that were subject to a lock-up agreement and that had properly been registered and appropriate for sale.

## II.  Facts Established by Pleadings or by Stipulations or Admissions of Counsel.

### a.  Concise Joint Evidentiary Summary

4.      On August 4, 2014, BMP Holdings, Inc. ("BMP") was incorporated in Delaware. Sargent was BMP's CEO, CFO, and sole director.

5.      Between September and December 2014, BMP issued 168,000 shares in a private offering to 32 shareholders. The chart below summarizes the following: the names of the shareholders, number of shares purchased by each shareholder, the amount of money each shareholder paid for the shares, the price per share, the date of the subscription agreement, the date of each shareholder's check provided with the purchase agreement, and to whom the check was made payable.[5]

| Shareholder Name | Shares Issued | Total Paid | Price Per Share | Subscription Agreement Date | Check Date | Check Payable to |
|---|---|---|---|---|---|---|
| Scott Adams | 5,000 | $50 | $0.01 | 09-29-2014 | 09-26-2014 | BMP |
| Claire Bacon | 5,000 | $50 | $0.01 | 09-20-2014 | 09-10-2014 | BMP |

[5] The parties dispute whether Sargent remained the beneficial owner/controller of these shares and thus whether the shares were ever "purchased" or "sold" by the shareholders.

| Shareholder Name | Shares Issued | Total Paid | Price Per Share | Subscription Agreement Date | Check Date | Check Payable to |
|---|---|---|---|---|---|---|
| Cynthia Bishop | 5,000 | $50 | $0.01 | 12-30-2014 | 12-30-2014 | BMP |
| Jason Bishop | 5,000 | $50 | $0.01 | 12-30-2014 | 12-30-2014 | BMP |
| Linda Carlsen | 3,000 | $30 | $0.01 | 09-30-2014 | 10-10-2014 | BMP |
| Carolyn Cook | 10,000 | $100 | $0.01 | 12-20-2014 | 12-20-2014 | [blank] |
| Benjamin Delgado | 5,000 | $50 | $0.01 | 09-26-2014 | 09-29-2014 | BMP |
| Erica Evans | 5,000 | $50 | $0.01 | 09-30-2014 | 10-10-2014 | BMP |
| Jerry Evans | 5,000 | $50 | $0.01 | 09-30-2014 | 10-10-2014 | BMP |
| James Girolamo | 5,000 | $50 | $0.01 | 12-29-2014 | 01-01-2015 | BMP |
| Lynn Girolamo | 5,000 | $50 | $0.01 | 12-29-2014 | 01-09-2015 | BMP |
| Daniel Griffin | 5,000 | $50 | $0.01 | 09-29-2014 | 09-29-2014 | BMP |
| Robert Gyemant | 5,000 | $50 | $0.01 | 09-29-2014 | 09-29-2014 | BMP |
| Jonathan Hicks | 5,000 | $50 | $0.01 | 09-30-2014 | 09-30-2014 | BMP |
| Taylor Hicks | 5,000 | $50 | $0.01 | 09-30-2014 | 09-30-2014 | BMP |
| Audrey Huss | 5,000 | $50 | $0.01 | 12-01-2014 | 12-01-2014 | BMP |
| Conrad Huss | 5,000 | $50 | $0.01 | 12-01-2014 | 12-01-2014 | BMP |
| Daniel Mazursky | 5,000 | $50 | $0.01 | 12-15-2014 | 12-15-2014 | [blank] |
| Tanya Mazursky | 5,000 | $50 | $0.01 | 12-15-2014 | 12-15-2014 | [blank] |
| Carol McCahon | 5,000 | $50 | $0.01 | 09-30-2014 | 10-14-2016 | BMP |
| Dennis McCahon | 5,000 | $50 | $0.01 | 09-30-2014 | 10-14-2016 | BMP |
| Bodhnarine Persaud | 5,000 | $50 | $0.01 | 09-26-2014 | 10-02-2014 | BMP |
| Richard Persaud | 5,000 | $50 | $0.01 | 10-06-2014 | 10-06-2014 | BMP |
| Sabrina Persaud | 5,000 | $50 | $0.01 | 10-08-2014 | 10-08-2014 | BMP |
| Elizabeth Reed | 5,000 | $50 | $0.01 | 09-30-2014 | 10-09-2014 | BMP |
| Kelly Reed | 5,000 | $50 | $0.01 | 09-30-2014 | 10-09-2014 | BMP |
| James Riley | 5,000 | $50 | $0.01 | 09-29-2014 | 09-29-2014 | BMP |
| Lidia Santos | 5,000 | $50 | $0.01 | 10-21-2014 | 10-21-2014 | BMP |
| Carolyn Sargent | 10,000 | $100 | $0.01 | 12-25-2014 | 12-25-2014 | Henry Sargent |
| Mary Saunders | 5,000 | $50 | $0.01 | 09-30-2014 | 09-30-2014 | BMP |
| Steve Saunders | 5,000 | $50 | $0.01 | 09-30-2014 | 09-30-2014 | BMP |
| Thomas Saunders | 5,000 | $50 | $0.01 | 10-09-2014 | 10-09-2014 | BMP |
| **Total / Avg** | **168,000** | **$1,680** | **$0.01** | | | |

6.     On January 1, 2015, Sargent contributed his membership interest in Buddhi Mat LLC to BMP in exchange for 5 million shares of restricted BMP common stock.

7.     On May 11, 2015, BMP filed a Form S-1 registration statement with the Securities and Exchange Commission.  The purpose of the Form S-1 was to register the above-described 32

shareholders' sale of 168,000 shares of BMP common stock.  The Commission issued a Notice of Effectiveness to BMP's third amended Form S-1 on August 12, 2015.

8.      On January 21, 2016, the Financial Industry Regulatory Authority ("FINRA") issued a stock symbol ("BMPP") for BMP, permitting BMP stock to be quoted on the OTC market.

9.      In or around June 2016, three BMP shareholders assigned their shares to shareholder Bodhnarine Persaud.  According to the terms of their assignment agreements, Sabrina Persaud (Bodhnarine Persaud's wife) assigned 5,000 BMP shares to him for $100 ($0.02 per share); Richard Persaud (Bodhnarine Persaud's son) assigned 5,000 BMP shares to him for $100 ($0.02 per share); and Eloise "Linda" Carlsen assigned 3,000 BMP shares to him for $100 ($0.03 per share). Together with the 5,000 BMP shares already in his name, after the assignments Bodhnarine Persaud owned 18,000 BMP shares.[6]

10.     On or about August 18 or 19, 2016, Sargent and PixarBio Corporation executed a stock purchase agreement.  Pursuant to the language of the agreement:

    a.   PixarBio paid $108,500 to Sargent for 5 million restricted shares in Sargent's name and paid $216,500 to BMP as a capital contribution to pay off BMP's outstanding debt.

    b.   Sargent entered a management agreement with PixarBio to manage Buddhi Mat LLC.  Sargent also maintained an option to purchase Buddhi Mat LLC.

11.     From the $216,500 that PixarBio paid BMP, BMP paid $191,500 to Sargent and $25,000 to Tomasek.

---

[6] The parties dispute whether these transactions were bona fide sales for consideration.  *See supra* footnote 1.

12.     Sargent executed a lock-up agreement with PixarBio dated August 18, 2016, in which he agreed not to sell, assign, or otherwise transfer 10,000 shares of BMP stock for six months.

13.     Persaud executed a lock-up agreement with PixarBio dated August 18, 2016, in which he agreed not to sell, assign, or otherwise transfer 18,000 shares of BMP stock for six months.

14.     In or around August and September of 2016, all BMP shares previously held by the 32 shareholders described above were transferred to Murl Jay Herod (a friend of PixarBio CEO Frank Reynolds), Patrick Giordano (who was involved in brokering the BMP-PixarBio transaction) and Sargent, in the transactions summarized in the chart below:[7]

| Shareholder | Shares | Amount Paid | Amount per Share | Assignee |
|---|---|---|---|---|
| Scott Adams | 5,000 | $100 | $0.02 | Herod |
| Claire Bacon | 5,000 | $100 | $0.02 | Herod |
| Carolyn Cook | 10,000 | $200 | $0.02 | Herod |
| Benjamin Delgado | 5,000 | $100 | $0.02 | Herod |
| Erica Evans | 5,000 | $100 | $0.02 | Herod |
| Jerry Evans | 5,000 | $100 | $0.02 | Herod |
| James Girolamo | 5,000 | $100 | $0.02 | Herod |
| Lynn Girolamo | 5,000 | $100 | $0.02 | Herod |
| Daniel Griffin | 5,000 | $100 | $0.02 | Herod |
| Robert Gyemant | 5,000 | $100 | $0.02 | Herod |
| Jonathan Hicks | 5,000 | $100 | $0.02 | Herod |
| Taylor Hicks | 5,000 | $100 | $0.02 | Herod |
| Audrey Huss | 5,000 | $100 | $0.02 | Herod |
| Conrad Huss | 5,000 | $100 | $0.02 | Herod |
| Daniel Mazursky | 5,000 | $100 | $0.02 | Herod |
| Tanya Mazursky | 5,000 | $100 | $0.02 | Herod |
| Carol McCahon | 5,000 | $100 | $0.02 | Herod |
| Dennis McCahon | 5,000 | $100 | $0.02 | Herod |
| Elizabeth Reed | 5,000 | $100 | $0.02 | Herod |

---

[7] Defendant disputes the relevance and admissibility of evidence relating to Herod and Giordano's purchase and sale of PixarBio shares and will separately move *in limine* to preclude the introduction of such evidence.  This information is included for reference to the extent such evidence is deemed admissible.

| Shareholder | Shares | Amount Paid | Amount per Share | Assignee |
|---|---|---|---|---|
| Kelly Reed | 5,000 | $100 | $0.02 | Herod |
| James Riley | 5,000 | $100 | $0.02 | Herod |
| Thomas Saunders | 5,000 | $100 | $0.02 | Herod |
| Lidia Santos | 5,000 | $100 | $0.02 | Herod |
| Mary Saunders | 5,000 | $100 | $0.02 | Herod |
| Steve Saunders | 5,000 | $100 | $0.02 | Herod |
| Cynthia Bishop | 5,000 | $100 | $0.02 | Giordano |
| Jason Bishop | 5,000 | $100 | $0.02 | Giordano |
| Bodhnarine Persaud | 18,000 | $2,000 | $0.11 | Sargent |
| Carolyn Sargent | 10,000 | $1,000 | $0.10 | Sargent |
| **Total / Avg** | **168,000** | **$5,800** | **$0.03** | |

15.     On October 11, 2016, PixarBio issued a press release announcing a 9 for 1 stock dividend of all issued and outstanding shares, which included all BMP shares transferred in August and September 2016.  As a result of the dividend, the Sargent owned 280,000 shares.

16.     On October 30, 2016, PixarBio issued a press release announcing the finalization of a merger transaction between PixarBio and BMP, and that public trading of stock in PixarBio (the surviving entity) would begin on October 31, 2016.[8]

17.     On November 2, 2016, PixarBio CEO Frank Reynolds emailed Sargent a "Termination of Lock Up Agreement," signed by Reynolds on behalf of PixarBio.  The agreement stated, among other things, that PixarBio released Sargent from any further selling restriction as

---

[8] PixarBio's Form 8-K, filed November 4, 2016, described the merger and related corporate transactions in substance as follows:  PixarBio (at the time a Nevada corporation) acquired BMP pursuant to the stock purchase agreement described above.  On October 13, 2016, BMP formed PixarBio Acquisition Corp., a wholly-owned subsidiary of BMP.  PixarBio Acquisition Corp. was merged into PixarBio, which continued as the surviving entity following that merger.  Effective October 31, 2016, BMP merged with PixarBio, with BMP continuing as the surviving entity following that merger.  BMP was renamed to PixarBio Corporation (now a Delaware corporation) after the merger.

contemplated in the lock up agreement he entered in connection with the August 2016 stock purchase agreement between Sargent and PixarBio.

18.     From November 3, 2016 through January 18, 2017, Sargent sold 109,187 shares of PixarBio for $630,979.[9]

### b.   Authenticity and Business Record Stipulation

The parties will agree to a stipulation that would negate the need to call any witness solely for the purpose of authenticating documentary evidence or otherwise establishing that certain documents are business records.  The parties intend to file a stipulation reflecting this agreement. The parties would agree to reserve the right to object to the admission of any evidence covered by the stipulation on other grounds, such as Federal Rules of Evidence ("FRE") 401 and/or 403.

### c.   Instrumentalities of Interstate Commerce and Securities Stipulation

In addition to the foregoing, the parties will stipulate that (a) Sargent, used instrumentalities of interstate commerce when he sold PixarBio (f/k/a BMP Holdings Inc.) securities; and (b) that PixarBio's equities are securities.

## III.   Contested Issues of Fact

The fundamental question in this case concerns the nature of the record shareholders' relationship with Sargent (and BMP).  The Commission contends that many, if not all, of the record shareholders merely agreed to be identified as shareholders for a nominal fee, which enabled Sargent to make it seem as if BMP was in compliance with the requirements to be listed for trading on the

---

[9] On November 3, 2016, Sargent entered into a 10b5-1 Trading Plan with his broker by which Sargent instructed his broker to sell PixarBio shares at certain prices relative to market bids, placed limits on the amount of shares to be sold per hour and per day, and to engage in no sales "below $17.00 per share."  Sargent terminated the agreement on November 9, 2016.  From November 3, 2016, through November 9, 2016, 4,353 of Sargent's PixarBio shares sold for approximately $68,000.

OTC Markets, and enabled Sargent to have access to purportedly unrestricted shares. Specifically, a publicly traded company was at that time required to have least 30 shareholders of record before it could be listed for trading on the OTC Markets. The Commission further contends that Sargent maintained control, directly or indirectly, over the disposition of the record shareholders' stock as evidenced by, among other things, (a) Sargent's ability to consolidate and deliver *all* of the record shareholders' stock to Sargent, Herod, and Giordano; (b) Sargent's failure to disclosure material information about the nature of the transaction to the record shareholders; (c) the record shareholders' lack of inquiry about the BMP-PixarBio Transaction; and (d) corporate actions Sargent took without soliciting the consent of the record shareholders. In light of these contentions, the Commission alleges that Sargent made false and misleading statements in a publicly-filed BMP registration statement when he represented, through BMP, that "[n]one of the selling securities holders [the record shareholders] are affiliates or controlled by our affiliates."[10] The Commission further alleges that Sargent's conduct was deceptive because he gave the false impression to the market—through BMP's registration statement—and to securities intermediaries, like transfer agents and brokers, that the record shareholders were independent, bona fide shareholders when, in actuality, many, if not all, of them were not. And, the Commission alleges that because the record shareholders were actually affiliates of BMP (by virtue of Sargent's power to influence the disposition of their shares), the stock that flowed from BMP to the record shareholders; and then to

---

[10] SEC Rule 144 defines an "affiliate" as a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer (e.g., BMP, which was controlled by Sargent). 17 C.F.R. § 230.144. SEC Rule 405 defines "control" as meaning "the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person . . . ." 17 C.F.R. § 230.405.

Sargent, Herod, and Giordano; and then to the public, constituted an unregistered distribution by an issuer.[11]

Sargent, on the other hand, contends that he did not control the record shareholders and was not in a position to exert sufficient influence on the record shareholders such that the record shareholders could be deemed affiliated with either BMP or Sargent.  In that regard, Sargent maintains that he disclosed material information about the investment to the record shareholders with whom he had direct communication; that there were numerous record shareholders with whom Sargent had no direct or indirect communication and with whom he had no relationship whatsoever and therefore had no ability to influence or control and, in fact, exerted no influence or control; that record shareholders made independent decisions to sell their shares based on a bona fide offer to purchase such shares from a third party (at the same price at which Sargent sold his shares); and that BMP corporate actions did not require consent of the record shareholders.

## IV.    Jurisdictional Questions

The parties do not believe any jurisdictional issues will be raised in this case.

## V.    Questions Raised by Pending Motions

### a.    Commission's Argument.

The Commission has moved for partial summary judgment against Sargent concerning its allegation that Sargent sold PixarBio stock in violation of Section 5 of the Securities Act.  *See* Dkt. Nos. 144-46.  Sargent, Herod, and Giordano sold PixarBio stock in public sales without registering those sales.  The Commission alleges that Sargent was required to register those sales because he did

---

[11] And, regardless, when Sargent sold PixarBio stock in November 2016, he was within 90 days of being an affiliate of BMP, which required him to comply with the "affiliate" elements of SEC Rule 144 if he wanted to rely on that safe harbor from registration, which he did not do.

not qualify for any exemption from registration or otherwise comply with SEC Rule 144, which provides a safe harbor from registering the sale of stock.

**b. Sargent's Response.**

Sargent argues that his sales did not involve an issuer, underwriter, or dealer and, therefore, his sales qualified for an exemption from registration pursuant to Section 4(a)(1) of the Securities Act.  Sargent was never a dealer, and the Commission does not allege otherwise.  At the time of the sales, Sargent had resigned his positions with BMP, and therefore was no longer an affiliate or control person and was no longer an issuer.  Persaud, from whom Sargent acquired the shares, also was not an affiliate of the issuer.  Further, the shares were subject to a sixth-month lock-up agreement.  Accordingly, because Sargent did not acquire the shares from the issuer, and because he did not acquire them with the intent to participate in a distribution, he was not an underwriter.  Sargent's sales therefore were exempt from registration pursuant to Section 4(a)(1).

*** 

The Court has set a hearing on this motion for January 13, 2022.

**VI.   Issues of law, including Evidentiary Questions**

The parties intend to file several motions in limine on or before January 11, 2022, on the topics identified below.  Other than the matters identified below, the parties are not presently aware of other contested issues of law.

The Commission intends to file motions in limine to:

a. Admit certain out of court statements of Joseph Tomasek against Sargent under Fed. R. Evid. 801(D)(2)(C) and (D) because such statement were authorized by Sargent and/or made in his capacity as an agent of Sargent.

b. Admit evidence of Sargent's involvement in soliciting shareholders for two other companies, JQ Holdings and Hadji International, to show, among other things, Sargent's state of mind and intent, and, alternatively, as prior acts under Fed. R. Evid 404(b).

c.   Preclude Defendant's expert, Randolf Katz, from testifying on certain topics because such testimony would, among other things, be unhelpful to the jury under Fed. R. Evid. 702 and improperly encroach on the function of the jury.

d.   Preclude the testimony of previously undisclosed fact witness Holly Fracassi.

Defendant intends to file motions in limine to:

a.   Preclude mentioning the indictment, criminal trial, and convictions of persons associated with PixarBio or the settlements entered by former defendants in the instant civil litigation as irrelevant and unfairly prejudicial under Fed. R. Evid. 403.

b.   Preclude the testimony of the Commission's expert, Robert Robbins for multiple reasons, including its encroachment on the function of the Court and the jury.

c.   Preclude the admission of summary charts that group, combine, or associate the activities of Sargent with those of PixarBio representatives Herod and Giordano as unfairly prejudicial under Fed. R. Evid. 403 and communicates a misimpression that Sargent acted with or in response to Herod's and/or Giordano's actions or was aware of their activities.

d.   Preclude the Commission from referring to BMP as a "shell" or a "shell company" and from introducing into evidence or referring to the concept of "shell" or "shell company."

e.   Preclude the Commission from arguing that Sargent remained an "issuer" when selling shares into the market.

## VII.   Requested Amendments to the Pleadings, if Any

Neither party is requesting that the pleadings be amended.

## VIII.   Additional Matters to Aid in the Disposition of the Action

## IX.   The Probable Length of the Trial.

The Commission anticipates that the trial will be three weeks, assuming the Court sits from

9:00 a.m. to 1:00 p.m.

Defendant anticipates that the trial will be four weeks unless the Court sits for extended days.

## X.   Witness Information

### a.   Plaintiff

The Commission has attached hereto, as Exhibit A, its first Witness List.

    **b.  Defendant**

Mr. Sargent has attached hereto, as Exhibit B, his first Witness List.

**XI.     Proposed Exhibits**

The parties have attached hereto, as Exhibits C and D, an agreed-upon exhibit list and

exhibits subject to objections.

**XII.    Parties' Respective Positions on any Remaining Objections to the Evidence Identified
Pursuant to Fed. R. Civ. P. 26(a)(3).**

    **a.  The Commission May Move *in Limine* to Exclude Previously Undisclosed Evidence.**

Sargent identified at least one witness on his witness list that was not previously disclosed to

the Commission, Holly Fracassi.  This witness may have instructed yoga classes at Buddhi Mat LLC

in 2016.  Sargent's counsel informed the Commission that this witness just became known to

counsel.  While that may be the case, Sargent was, of course, aware of this witness from the moment

he hired her to do the work she purportedly did for his company.  The Commission is considering

whether to move to exclude Ms. Fracassi's trial testimony.

Further, Sargent has identified a number of exhibits without bates numbers, or any other clear

evidence of being previously produced.[12]  The Commission has been conferring with counsel about

these documents, and is reviewing its files to see if it can determine that the documents were

previously produced or otherwise disclosed by Sargent on his initial disclosures.  If not, the

Commission may move *in limine* to exclude this evidence or may otherwise object to its

introduction.

---

[12] The Commission understands that Sargent's counsel cannot readily identify whether these
documents were previously produced because Sargent's prior productions were made through a
different law firm that is no longer engaged in this matter.

**b. Commission's Objections to Various Emails Identified by Sargent as Exhibits.**

Sargent identified a number of emails that do not involve him or his agent, Tomasek. The Commission asked Sargent to identify why these emails are relevant and otherwise admissible. Sargent declined at this time and suggested that the foundation for establishing admissibility will be made through witnesses at trial. The Commission, therefore, reserves the right to object to these exhibits, but may withdraw its objection depending on the foundation established at trial.

Further, Sargent identified a number of emails involving himself or Tomasek that the Commission does not intend to introduce in its case-in-chief. The Commission objects to the admission of these emails pursuant to Fed. R. Evid. 801 because Sargent cannot introduce his own statements (or statements made on his behalf) for the truth. Should Sargent seek to introduce these types of emails for a purpose other than to establish the truth of the matters asserted therein, the Commission may withdraw its objection.

**c. The Commissions Objections to Various Other Exhibits.**

Sargent has identified a number of exhibits that do not appear to be relevant, or admissible, such as the report of his own expert. *See Crawford-Brunt v. Kruskall*, 489 F. Supp. 3d 1, 4 (D. Mass. 2020) (expert report is inadmissible hearsay). Sargent has declined to remove documents like this from his exhibit list and, instead, informed the Commission that he marked several documents for identification that he might only use for non-evidentiary reasons, such as to impeach witnesses or refresh their recollection. Because the Commission cannot determine, at this time, whether several of the currently identified exhibits are marked merely for identification, or (instead) to be admitted at trial, the Commission has raised objections. The objections are, of course, moot if Sargent does not seek to introduce into evidence the documents subject to these objections.

**d.   Sargent's Objections to Various Emails Identified by the Commission as Exhibits.**

The Commission identified a number of email trains that include both admissible and inadmissible emails, or perhaps emails that will require a proper foundation before being entered into evidence.  The Commission declined to separate the emails that are admissible, for example, because they are statements of Sargent, and other emails in the email train.  Sargent, therefore, reserves the right to object to these emails, but may withdraw its objection depending on the foundation established at trial or, when appropriate, if there is a proper limiting instruction.

**e.   Sargent's Objections to Exhibits and Charts, Including Summary Charts, that Inaccurately Combine Sargent's Activities With Those of PixarBio Representatives With Whom He Had No Connection or Common Scheme**

The Commission proffers exhibits, charts and summary charts that combine the activities of Sargent with those of PixarBio representatives.  Sargent had no contact with, nor had he ever heard of, anyone associated with PixarBio or the company itself until the summer of 2016.  Further, there is no evidence that he ever had anything but an arms' length relationship with any of those individuals.  To combine the activities of Sargent with the PixarBio representatives, or to present trading activity of all of those people combined, is misleading and certainly the probative value of any such evidence is outweighed by its prejudicial impact.

**f.   Possible Testimony of Holly Fracassi**

Sargent has informed the Commission that he understands that Ms. Fracassi might be available for a pre-trial deposition or interview if the Commission believes (a) there was untimely disclosure of her identity and (b) it has been prejudiced.

Dated:  January 6, 2022

Respectfully submitted,

**SECURITIES AND EXCHANGE
COMMISSION**

By its Attorneys,

/s/ Eric A. Forni
Eric. A. Forni (Mass. Bar No. 669685)
David J. D'Addio (Mass. Bar No. 665790)
Senior Trial Counsel
Jonathan R. Allen (Mass. Bar No. 680729)
Senior Enforcement Counsel
Boston Regional Office
33 Arch Street
Boston, MA  02110

**HENRY B. SARGENT**

By his attorneys,

/s/ Peter R. Ginsberg
Peter R. Ginsberg
Moskowitz & Book, LLP
345 Seventh Avenue
New York, NY 10001
212-221-7999
pginsberg@mb-llp.com

## <u>Certificate of Service</u>

  I, Eric A. Forni, certify that on January 6, 2022, I filed the foregoing motion electronically with the Court. The filing will be sent to the registered participants as identified on the Notice of Electronic Filing and may also be accessed through the Court's ECF system.


       /s/ Eric A. Forni
       Eric A. Forni