UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
SECURITIES AND EXCHANGE COMMISSION,)
                               )
              Plaintiff,       )
        v.                     )        CIVIL ACTION
                               )        NO. 19-11416-WGY
HENRY B. SARGENT,              )
                               )
              Defendant.       )
_____)
```

YOUNG, D.J.                              March 8, 2022

**MEMORANDUM OF DECISION**

## I.   INTRODUCTION

"Summary judgment is overused across our courts." SEC v. EagleEye Asset Mgmt., 975 F. Supp. 2d 151, 155 (D. Mass. 2013). The late Judge Richard Arnold reflected:

> [W]e've seen . . . tremendous pressures to decide
> cases without thinking very much about them,
> tremendous pressures to avoid deciding cases.  I mean,
> some judges will do almost anything to avoid deciding
> a case on the merits and find some procedural reason
> to get rid of it, coerce the parties into settling or
> whatever it might be.

Hon. Richard Arnold, Mr. Justice Brennan and the Little Case, 32 Loy. L.A. L. Rev. 663, 670 (1999).  This Court is particularly mindful of this perhaps ill-advised trend and seeks to remain impervious to such pressures when faced with motions that risk feeding into this cycle.  This, however, is not to say that summary judgment is never appropriate.  Indeed, courts must

grant summary judgment in cases where the facts require it. This is one such case.

In this Securities and Exchange Commission ("Commission") enforcement action against Defendant Henry B. Sargent ("Sargent"), the Commission seeks partial summary judgment on its section 5 claim.  Section 5 of the Securities Act of 1933 (the "Securities Act") prohibits unregistered sales of securities.  Because registration usually is expensive and time-consuming, see SEC v. M & A West, Inc., No. C-01-3376 VRW, 2005 WL 1514101, at *1 (N.D. Cal. 2005), Congress provided exemptions in section 4 of the Securities Act when disclosure would serve little purpose to the public, 15 U.S.C. § 77d.  One such exemption is for "trading" transactions between two members of the investing public.  Id. § 77d(a)(1).  This exemption is narrowly circumscribed and excludes "transactions by . . . an issuer, underwriter, or dealer," id., who may possess inside information and, thus, disproportionate power over the public. Underwriters are defined as individuals who purchased their shares from an issuer -- anyone controlled by the issuing company or person -- with a view to distribution.  See id. § 77b(a)(11).

A central issue in this case is whether Sargent is an underwriter and thus liable for evading the registration requirement.  This question ultimately hinges on whether the

shareholders from whom Sargent purchased his shares were
"issuers." Generally, that is a question of fact for a jury.
Sargent's case, however, is unique in this respect: the
**undisputed** material facts of Sargent's case are so overwhelming
as to leave no room for a reasonable jury to find for Sargent.
Accordingly, this Court GRANTED the motion for partial summary
judgment.

## II.  PROCEDURAL HISTORY

In June 2019, the Commission brought this enforcement
action against Sargent, Frederick M. Mintz, Alan P. Fraade,
Joseph J. Tomasek ("Tomasek"), and Patrick Giordano ("Giordano")
(collectively, the "Defendants"). Compl. ECF No. 1. The
complaint asserts multiple claims against each defendant. Id.
26-32. Specifically, Count 1 asserts a violation of section
10(b) of the Securities Exchange Act (the "Exchange Act") and
its implementing regulation, Rule 10b-5, id. 26-28; Count 2 a
violation of section 17(a) of the Securities Act, id. 28-29; and
Count 3 a violation of section 5(a) and 5(c) of the Securities
Act, id. 29-32.

In September 2019, the Defendants moved to dismiss the
complaint. See Def. Joseph Tomasek's Mot. Dismiss Compl., ECF
No. 32; Notice Mot. Dismiss Compl. Frederick Mintz & Alan
Fraade, ECF No. 34; Def. Patrick Giordano's Mot. Dismiss Compl.,
ECF No. 37; Def. Henry Sargent's Mot. Dismiss Compl., ECF No.

39.  In November 2019, this Court held a hearing and denied all the motions.  Clerk's Note, ECF No. 66.

On July 8, 2021, the Commission moved for partial summary judgment on its section 5 claims against Sargent, Tomasek, and Giordano.  Pl.'s Mot. Partial Summ. J., ECF No. 144.  In September and November 2021, this Court entered judgment by consent against Giordano and Tomasek, respectively.  See J. Def. Patrick Giordano, ECF No. 173; J. Def. Joseph Tomasek, ECF No. 176.  Accordingly, the claims against Giordano and Tomasek were terminated.

The Commission and Sargent have briefed the motion.  See generally Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem."), ECF No. 145; Henry Sargent's Mem. Law Opp'n Commission's Mot. Partial Summ. J. ("Sargent's Opp'n"), ECF No. 159; Pl.'s Reply Supp. Mot. Partial Summ. J., ECF No. 162; Henry Sargent's Sur-Reply Mem. Law Opp'n Commission's Mot. Partial Summ. J. ("Sargent's Sur-Reply"), ECF No. 165.

On January 13, 2022, after a full hearing, the Court tentatively granted the Commission's motion for partial summary judgment.  Electric Clerk's Notes (Jan. 13, 2022), ECF No. 189.  This memorandum of decision confirms the order and explains the Court's reasoning.

### III. UNDISPUTED FACTS

In August 2014, Sargent incorporated BMP Holdings, LLC ("BMP"). Def. Sargent's Resp. Pl.'s Statement Undisputed Facts ("Sargent's Resp. Facts") 1, ECF No. 158. Sargent served as BMP's CEO, CFO, majority shareholder, and sole director. <u>Id.</u> BMP's business included operating a yoga studio. <u>Id.</u> 5-6.

Between September and December 2014, BMP issued 168,000 shares to thirty-two individuals ("S-1 Shareholders") for $0.01 per share, a total of $1,680. <u>Id.</u> 4. Sargent's purpose in recruiting the S-1 Shareholders was not to fund the operations of BMP but to "get a shareholder base." <u>Id.</u> 5 (internal quotation marks omitted). His plan was to take BMP public so that "he could attract investors in order to expand or reconstitute the yoga business." <u>Id.</u>

In January 2015, Sargent contributed to BMP his interest in a small yoga studio that he had operated at a loss. <u>Id.</u> 3. In exchange for the studio and subsequent working capital to BMP (in the form of loans amounting $191,500), Sargent caused BMP to issue 5,000,000 shares to himself. <u>Id.</u> 5-6. In May 2016, Sargent caused BMP to issue him 245,000,000 shares. <u>Id.</u>

On May 11, 2015, Sargent caused BMP to file a Form S-1 registration statement with the Commission. <u>Id.</u> On August 12, 2015, the Commission issued a Notice of Effectiveness. <u>Id.</u> The

S-1 registration provided a mechanism by which the S-1 Shareholders could sell their shares.  Id. 6-7.

On or about September 22, 2015, at Sargent's request, a brokerage firm filed a Form 15c-211 application to the Financial Industry Regulatory Authority ("FINRA").  Id. 7.  On January 21, 2016, FINRA cleared BMP stock to be quoted on the over-the-counter market ("OTC market").  Id.

From May 2016 through August 2016, BMP's lawyer and various financial consultants engaged in negotiations in anticipation of the potential acquisition of BMP by PixarBio ("Pixar"), which was a biology technology company in Massachusetts.  Id. 8-9. Sargent's intention, however, was not necessarily to find a company for a reverse merger but to "locate investors who would help fund the development of his yoga studio business."  Id.

On July 11, 2016, Sargent sent blank stock powers[1] to the S-1 Shareholders.  Id. 12.  The Shareholders then "sent the stock powers back to Sargent signed and guaranteed, but without a buyer filled in."  Id.

---

[1] A stock power is "a legal document -- separate from a securities certificate -- that investors can use to transfer or assign ownership to another person."  U.S. Securities and Exchange Commission, Security Power, https://www.sec.gov/fast-answers/answerssecuritypowerhtm.html (last visited Mar. 3, 2022).  Stock powers generally "are used either: (1) as a matter of convenience when an owner cannot sign the actual certificates; or (2) for safety (such as sending unsigned certificates in one envelope and signed powers in another)." Id.

On August 19, 2016, Sargent and Pixar executed a stock purchase agreement.[2]  Id. 9.  Under the agreement, Sargent sold his 5,000,000 restricted shares of BMP to Pixar for $325,000.  Id.  In the purchase agreement, Sargent promised to deliver "lockup" agreements with certain S-1 Shareholders owning 25,000 shares of BMP stock, whereby those owners would promise not to sell their shares for six months.  Id. 12.  Pixar later cancelled the other 245,000,000 shares in Sargent's name.  Id.

---

[2] The transaction between the BMP and Pixar was **allegedly** a "reverse merger."  Pl.'s Mem. 8 (asserting that Sargent facilitated a reverse merger); Sargent's Opp'n 26-27 (implying that Sargent did not execute a reverse merger).  "A reverse merger is a transaction in which a privately-held corporation acquires a publicly-traded corporation, thereby allowing the private corporation to transform into a publicly-traded corporation without the necessity of making an initial stock offering."  United States v. Weed, 873 F.3d 68, 70 n.2 (1st Cir. 2017) (citing SEC v. M & A W Inc., 538 F.3d 1043, 1046-47 (9th Cir. 2008)).  Often times, "the public corporation is a shell company with minimal assets and liabilities and no actual operations."  Id.  "To effect the reverse merger, the shell public corporation will exchange its treasury stock for all outstanding shares of the privately-held corporation.  In consideration, the controlling shareholders of the shell public corporation transfer a majority of their shares to the owners of the private corporation."  Id.  After the reverse merger, "the private corporation is transformed into a publicly traded company, without going through the complicated process of an initial stock offering."  Id.

Note, however, that though Sargent does not seem to dispute that the transaction was ultimately to enable Pixar to become public, he denies that BMP was a "shell company."  Sargent's Opp'n 23-27.

9.  On the same day, August 19, 2016, Sargent resigned as president and director of BMP.  Id. 11.

During August 2016 -- shortly before and after August 19 -- the S-1 Shareholders' shares were transferred to three individuals: Sargent, Jay Herod ("Herod"), and Giordano.  See id. 9-11.  Both Herod and Giordano are associated with Pixar; Herod being a long-time friend of Pixar CEO and Giordano having facilitated the reverse merger.

Specifically, Herod executed a stock purchase agreement, dated August 23, 2016, purporting to buy 130,000 shares from twenty-five of twenty-nine[3] S-1 Shareholders.  Id. 9-10. Giordano executed a stock purchase agreement with two of the S-1 Shareholders, dated August 15, 2016, purporting to buy their 10,000 shares for $0.02 per share.  Id. 11.  Sargent executed a stock purchase agreement with his sister, also dated August 15, 2016, purporting to buy her 10,000 shares for $0.10 per share. Id.  Sargent further acquired 18,000 shares from Bodhnarine Persaud and paid him $2,000 by check dated September 2016.  Id. Critically, all of these transfers were done with the stock powers he had obtained from the S-1 Shareholders beforehand. Id. 12.

---

[3] There were only twenty-nine S-1 Shareholders at this time because three S-1 Shareholders assigned their shares to Bodhnarine Persaud, an accountant who was working for a different company owned by Sargent.  Sargent's Resp. Facts 10.

Thus, by the end of September at the latest, Herod had 130,000 shares, Giordano 100,000 shares, and Sargent 280,000 shares.

On October 11, 2016, BMP declared a 9-for-1 stock split. Id. 14.  On October 30, 2016, Pixar merged with BMP.  Id.  As a result of the stock split and merger, shares owned by Herod, Giordano, and Sargent -- the only shares available for sale on the public markets -- became shares of Pixar and multiplied by ten.  Id.

On October 31, 2016, public trading of Pixar stock began on the OTC market, opening at $3 per share.  Id.  As a result of Pixar management's "pumping"[4] -- detailed in the Commission's complaint in its enforcement action against Pixar and its officers in a different case, Compl. ¶ 3, SEC v. PixarBio Corp., No.1-18-cv-10797-WGY (D. Mass. Apr. 24, 2018), ECF No.1, -- the market value of Pixar stock immediately skyrocketed; by the close of public trading on October 31, the market value was $4.77.  Id.  On November 1, Pixar stock closed at $11, and on November 2, $30.  Id.  Below is a summary of these data:

---

[4] "In a typical 'pump and dump' scheme, insiders inflate demand for a stock by disseminating laudatory information about a company -- information that is usually false.  If the market reacts favorably, the insiders cash in their shares before the market readjusts and the share price collapses."  Weed, 873 F.3d at 70 n.1 (quoting Garvey v. Arkoosh, 354 F. Supp. 2d 73, 76 n.4 (D. Mass. 2005) (Stearns, J.)).

|          | Shares    | Price Paid | Oct. 31 ($4.77) | Nov. 1 ($11) | Nov. 2 ($30) |
|----------|-----------|------------|-----------------|--------------|--------------|
| Herod    | 1,300,000 | $2,600     | $6,201,000      | $14,300,000  | $39,000,000  |
| Giordano | 100,000   | $200       | $477,000        | $1,100,000   | $3,000,000   |
| Sargent  | 280,000   | $3,000     | $1,335,600      | $3,080,000   | $8,400,000   |
| Total    | 1,680,000 | $5,800     | $8,013,600      | $18,480,000  | $50,400,000  |

Over the course of selling their shares to the public, Herod, Giordano, and Sargent sold little more than twenty percent of their shares yet each made far more than the total price paid to the S-1 Shareholders. Id. 16.

|          | Price Paid to the S-1 Shareholders | Approximate Sales |
|----------|------------------------------------|-------------------|
| Herod    | $2,600                             | $900,000          |
| Giordano | $200                               | $115,000          |
| Sargent  | $3,000                             | $630,000          |
| Total    | $5,800                             | $1,645,000        |

On January 23, 2017, the Commission suspended public trading in Pixar stock. Id.

The diagram below represents how BMP shares moved from the S-1 Shareholders to Herod, Giordano, and Sargent and, post-merger, as shares of Pixar, to the public.



**IV.   THE SECURITIES ACT AND ACCOMPANYING REGULATIONS**

This Court begins by providing an overview of the Securities Act and related regulations.

### 1. Section 5

The purpose of the Securities Act is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." SEC v. Ralston Purina Co., 346 U.S. 119, 124 (1953).  To that end, section 5 provides that securities must be registered with the Commission before any person may sell or offer to sell such securities.  15 U.S.C. § 77e.  Registration entails disclosure of detailed information on the value of publicly traded securities, including the issuer's financial condition, the identity and background of management, investment risks, and the price of and amount of securities to be offered.  See id. §§ 77g, 77aa.

To prove a violation of section 5, the Commission must show the "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." SEC v. Bio Def. Corp, No. 12-11669-DPW, 2019 WL 7578525, at *13 (D. Mass. Sept. 6, 2019) (Woodlock, J.) (internal quotation marks and citation omitted).  Significantly, none of these elements require any proof of a defendant's state of mind.  See id.

[11]

Importantly as well, **once the Commission establishes a prima facie violation of section 5, the burden shifts to the defendant to prove that an exemption to the registration requirement applies.**  See Ralston Purina, 346 U.S. at 126 ("Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable."); Bio Def., 2019 WL 7578525, at *16.

## 2. The Section 4(a)(1) Exemption and Rule 144(k)

Section 4(a)(1) exempts "transactions by any person other than an issuer, underwriter, or dealer."[5]  15 U.S.C. § 77d(a)(1).  An underwriter is defined by the Act as:

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking . . . .  As used in this paragraph the term "issuer" shall include . . . any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

Id. § 77b(a)(11).

---

[5] Section 4(a)(1) is identical in all material respects to an earlier version of the Securities Act at section 4(1).  See 15 U.S.C. 77d(1) (2010); 15 U.S.C. 77d(a)(1)(2012).  This opinion refers to both versions interchangeably depending on which iteration of the statute was controlling at the time.

"The purpose of this exemption is to allow the free trading among individual investors of securities that have already been registered."  <u>SEC</u> v. <u>Cavanagh</u>, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998); <u>accord</u> <u>SEC</u> v. <u>Culpepper</u>, 270 F.2d 241, 247 (2d Cir. 1959).  In other words, Congress distinguished between (1) **distributions** of securities to the public by the issuer of the securities or from people in a control relationship with the issuer and (2) **trading** transactions between investors.  <u>See</u> <u>SEC</u> v. <u>Chinese Consol. Benevolent Ass'n</u>, 120 F.2d 738, 741 (2d Cir. 1941).  The first is prohibited; the second is allowed by the exemption under section 4(a)(1).  <u>See</u> <u>id.</u>

The Commission adopted Rule 144, providing clarification for those who acquire "restricted securities" -- securities that have never been publicly sold -- from the issuer or controlling persons of the issuer (or "affiliate") and later seek to resell those securities to the public without registration.  <u>See</u> 17 C.F.R. § 230.144(a)(3), (b).  Those people could be considered as acquiring securities "with a view to . . . distribution," under the statute, and thus as underwriters when they seek to resell.  <u>See</u> 15 U.S.C. § 77b(a)(11).  Rule 144 creates a safe harbor by limiting the definition of "underwriter"; anyone within the Rule 144 safe harbor is **not** an underwriter.

Specifically, under Rule 144, a seller is not deemed an underwriter if the seller is:

> not an affiliate of the issuer at the time of the sale
> and has not been an affiliate during the preceding three
> months, provided a period of one year has elapsed since
> the later of the date the securities were acquired from
> the issuer or from an affiliate of the issuer.

See 17 C.F.R. § 230.144(b)(1)(i).  An "affiliate," in turn, is defined as "a person that directly, or indirectly . . . controls, or is controlled by, or is under common control with [the] issuer."  Id. § 230.144(a)(1).

"Control" is defined by regulation as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  Id. § 230.405.  The determination whether someone occupies a "control" position (and thus is an affiliate) does not turn on any single factor but rather "depends on the totality of the circumstances, including an appraisal of the influence the individual has on the management and policies of a company."  Cavanaugh, 1 F. Supp. 2d at 366 (citing United States v. Corr, 543 F.2d 1042, 1050 (2d Cir. 1976)).

### 3. Summary of the Statutory and Regulatory Scheme

In brief, section 5 sets out registration requirements. Section 4 exempts certain transactions from section 5.  One such exemption is for transactions **not involving** underwriters, issuers, or dealers.  An underwriter is defined as someone who purchased shares from an issuer with a view to distribution.  An

[14]

issuer includes anyone controlled by the issuing entity or person.  Both definitions are sensible in requiring disclosures from insiders.  Issuers include individuals controlled by insiders to prevent sophisticated public companies from skirting the registration requirement by using third-party puppets.[6] Underwriters become insiders by acquiring shares from insiders (or "issuers").  Rule 144 clarifies who is **not** an underwriter: those who acquired shares directly from an issuer **if** they are not controlled by or controlling the issuer **and** they waited for one year before selling their shares.  Note that the one-year waiting period seems to be grounded in the Commission's understanding of what distinguishes "distribution" from **investment**.  If a person acquires shares purely for investment purposes, that person is not an underwriter, because they have no view towards distribution.

The following three conclusions emerge from the overlap of the Securities Act and the Commission's regulations.

Conclusion 1

---

[6] See Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L. Rev. 457, 459 (1987) ("If you want to know the law and nothing else, you must look at it as a bad man, who cares only for the material consequences which such knowledge enables him to predict. . . ."). Justice Holmes' "bad-man" formulation of law may apply to matters involving securities regulations with force, as sophisticated parties involved in securities transactions may well prioritize their monetary interests over morality.

If someone (1) acquired securities from an affiliate
(a person who controls or is controlled by an issuer),
(2) with a view to distribution, then that person is
an underwriter, and the section 4(a)(1) exemption does
**not** apply to any transactions in which he is involved.
This person is thus covered by the registration
requirement.

Conclusion 2

If someone (1) is not and has not been an affiliate of the
issuer within the last three months, and (2) at least one
year has elapsed since the securities to be sold were last
acquired from an issuer or affiliate of the issuer, then
that person is **not** an underwriter by virtue of Rule 144.

Conclusion 3

If anyone involved in the transaction is an underwriter,
issuer, or dealer, even if the defendant is not himself an
underwriter -- either because he falls under the Rule 144
safe harbor or because he does not meet the statutory
definition of "underwriter" -- the registration requirement
applies to the transaction, and the defendant is liable.

Conclusion 2 is "precisely limited to its terms." SEC v. Kern,

425 F.3d 143, 148 (2d Cir. 2005).  Even if someone does **not**

satisfy the two conditions, that does **not** necessarily mean that

person is an underwriter.  If the person can prove that he does

not fall under the statutory definition of underwriter, he is

not an underwriter.  In other words, failing to meet the two

conditions simply means that the person cannot get the benefit

of the safe harbor under Rule 144, and that person is not

**necessarily** liable.[7]

Conclusion 3 derives solely from the statutory language of section 4(a)(1), which, again, only exempts "**transactions** by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1) (emphasis added).

### V. ANALYSIS

The Commission moves for summary judgment on its claim under section 5 of the Securities Act, which requires registration of Securities, 15 U.S.C. § 77e.

This case presents two key issues. First, the parties disagree on whether the Commission's undisputed evidence establishes a prima facie violation of section 5. Sargent argues he did not engage in an unregistered sale because all the securities were registered by a Form S-1. Sargent's Opp'n 29, 32. The Commission rebuts that the registration requirement of section 5 applies to transactions not securities. Pl.'s Mem. 3-4. In other words, the dispute is whether registration "attaches" to securities, or transactions. As will be discussed, this is a relatively straight-forward question of statutory interpretation. See infra Section C.

---

[7] To conclude otherwise would be the fallacy of the inverse; one who lives in Boston lives in Massachusetts; yet one who does not live in Boston could still live in Massachusetts -- she might live in Worcester.

The parties' second disagreement is more complex and will be considered in greater depth.  See infra Section D.  The issue is whether Sargent was an "underwriter" for the purpose of section 4(a)(1) and thus subject to section 5's requirements. 15 U.S.C. § 77d(a)(1).  The Commission argues that he was because: (1) the S-1 Shareholders were "affiliates" (or "issuers"); (2) Sargent acquired the shares from the S-1 Shareholders with a view to distribution making him an "underwriter"; and (3) the section 4(a)(1) exemption applies to transactions **not** involving "an underwriter."  Pl.'s Mem. 3-5. Therefore, the Commission argues, Sargent's sale of his shares to the public was not exempt from section 5.  Id. 5.

Sargent disputes the first step, asserting that the S-1 Shareholders were not affiliates (or issuers).  Sargent's Opp'n 28-29.

This ultimately depends on whether the S-1 Shareholders were "controlled" by Sargent.  The Commission argues that the price disparity -- the unbelievable amount of profit Sargent made -- is sufficient to allow summary judgment on this basis. Thus, the issue that this Court must address can be phrased in the following way:

> Does Sargent's ability to collect all of BMP's public shares from the S-1 Shareholders for distribution at a fraction of the price for which they were sold constitute sufficient evidence to establish "control" over the Shareholders **as matter of law**?

[18]

The Second and Sixth Circuits would answer the question in the affirmative.  See <u>Kern</u>, 425 F.3d at 150; <u>SEC</u> v. <u>Sierra Brokerage Servs, Inc.</u>, 712 F.3d 321, 329-30 (6th Cir. 2013). When an individual has garnered large quantities of an issuer's shares at an extremely low price in anticipation of distribution, those Circuits held as matter of law that the individual controlled the shareholders from whom she acquired the shares.  See <u>Kern</u>, 425 F.3d at 150; <u>Sierra</u>, 712 F.3d at 329. The holdings of the Second and Sixth Circuits are an exception to the general rule; <u>viz.</u>, whether someone is in a position of control, **in general**, "is a question of fact which depends upon the totality of the circumstances," <u>United States</u> v. <u>Corr</u>, 543 F.2d 1042, 1050 (2d Cir. 1976).

The Commission concedes that this is a matter of first impression in the First Circuit and urges this Court to adopt the holdings of these two out-of-circuit cases.  Pl.'s Reply 4 ("The Commission acknowledges that its control argument rests primarily on the holdings of the Sixth and Second Circuits in <u>Sierra</u> and <u>Kern</u>.").  It does not, however, offer any argument as to **why** this Court ought adopt the holdings of <u>Kern</u> and <u>Sierra</u>. <u>See generally</u> Pl.'s Mem.

As for Sargent, he does not argue for an alternative approach; rather, he seeks to distinguish the cases cited by the

Commission on factual grounds.  Sargent's Opp'n 24-27.  He
fails, however, to explain why miniscule factual differences
between his case and the cases cited are of any legal
significance.

This memorandum of decision proceeds in the following
manner: First, it explains the Court's holding that section 5's
registration requirement applies to transactions not securities.
This holding entails the Commission has established a prima
facie case for a section 5 violation as matter of law.  Second,
it explains why Sargent has failed to show that a reasonable
jury could find an exception to the registration requirement
applies.  This Court interprets the two out-of-circuit cases
relied on by the Commission to establish a presumption of the
middle ground on the issue of the defendant's control.
Accordingly, it holds that the disparity between the price at
which Sargent purchased shares and the price at which he sold
those shares to the public establishes a presumption that he
controlled the sellers and thus was an underwriter, which
Sargent fails to adequately rebut.

## A.  The Commission Has Established a Prima Facie Violation of Section 5

To establish a prima facie violation of section 5, the
Commission must show the "(1) lack of a registration as to the
subject securities; (2) the offer or sale of the securities; and

(3) the use of interstate transportation or communication and the mails in connection with the offer or sale." Bio Def., 2019 WL 7578525, at *13; accord 15 U.S.C. §§ 77e(a), (e).

Here, Sargent concedes the second and third elements are met, but argues the first is not, insisting that the securities he sold were registered. Sargent's Opp'n 29 ("Sargent did not sell the shares in an unregistered transaction."). He argues (1) that he "purchased a limited number of shares from a few of the [S-1] Shareholders," and he did so "in compliance with the manner of sale ('privately negotiated transactions') . . . specified option in the Plan of Distribution set forth in the S-1" form, and (2) that he "sold those shares pursuant to the trading transaction exemption." Id. at 28.

As to the first point, the Commission argues that a "registration statement registers transactions not shares, meaning that each registration statement applies to each separate offer and sale and does not attach to the security itself." Pl.'s Mem. 3. Thus, "proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security." Id. at 4 (internal quotation marks omitted). The Commission does not, however, explain its rationale in depth, citing only to one out-of-circuit case. Id. (quoting SEC v. Universal Exp. Inc., 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007)). This is understandable,

as it appears that neither the First Circuit nor other sessions of this Court have directly addressed the issue.

On this matter of first impression, the Court holds that the registration requirement attaches to each transaction, not just each share.

### 1.   Section 5 Applies to Transactions

As an initial matter, the statutory language of section 5e(a) and (c) is ambiguous.  Section 5e(a) provides:

> (a) Sale or delivery after sale of unregistered securities.  Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly -- (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a).  Section 5e(c) provides:

> It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . .

Id. § 77e(c).

On one hand, both subsections prohibit selling or offering to sell unregistered securities, indicating that the registration requirement was intended to apply to each

transaction or offering.  On the other hand, the subsections refer to "unregistered securities," suggesting that registration attaches to securities.  Thus, the language of the statute does not provide clear guidance.

The spirit of the Act embodied by its legislative background, legislative history, and the design of the Securities Act all suggest that the requirement applies to transactions and not to securities.  See Hon. Stephen Breyer, Making Our Democracy Work 94-96 (2010) ("[J]udicial consideration of a statute's purposes helps to further the Constitution's democratic goals . . . . a purpose-oriented approach helps individual statutes work better for those whom Congress intended to help . . . . by emphasizing purpose the Court will help Congress better accomplish its own legislative work."); see Ralston Purina, 346 U.S. at 124-25 ("The natural way to interpret [an] exemption [to the section 5 registration requirement] is in light of the statutory purpose.").

Congress enacted the Securities Act, along with its sister statute (the Exchange Act), in response to "the sudden and disastrous collapse in prices of listed stocks in 1929, and the Great Depression that followed." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 78 (2006).  By enacting these two statutes, "Congress sought to eliminate the 'abuses which were found to have contributed to the stock market crash

[23]

of 1929 and the depression of the 1930's.'"  Chadbourne & Parke
LLP v. Troice, 571 U.S. 377, 403 (Kennedy J., dissenting)
(quoting SEC v. Capital Gains Rsch. Bureau, 375 U.S. 180, 186
(1963)).  "Investor confidence indicates fair dealing and
integrity in the markets."  Id. at 404.  It is "also critical to
achieving an efficient market."  Id.  Accordingly, "[t]he design
of the [Securities Act] is to protect investors by promoting
full disclosure of information thought necessary to informed
investment decisions."  Ralston Purina, 346 U.S. at 124; accord
Federal Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura
Holding Am., Inc., 873 F.3d 85, 96 (2d Cir. 2017) ("The Act's
chief innovation was to replace the traditional buyer-beware or
caveat emptor rule of contract with an affirmative duty on
sellers to disclose all material information fully and fairly
prior to public offerings of securities.").

Accordingly, the Supreme Court has emphasized that "[t]he
natural way to interpret [the Act] is in light of the statutory
purpose."  Ralston Purina, 346 U.S. at 124-25.[8]  Thus, the
applicability of section 5 "should turn on whether the
particular class of persons affected need the protection of the
Act."  Id. at 125.

---

[8] In Ralston Purina, the Court interpreted a different
exemption from section 5 afforded by section 4(1).  346 U.S. at
120.

Holding that the section 5 registration requirement attaches to securities would not protect members of the investing public who are at an unfair informational disadvantage.  As noted by the House Report,[9] the need to protect investors persists even after securities are registered as to the first transaction:

> [Section 2a(11)'s][10] second function is to bring within the provisions of the bill redistribution whether of outstanding issues or issues sold subsequently to the enactment of the bill.  All the outstanding stock of a particular corporation may be owned by one individual or a select group of individuals.  At some future date they may wish to dispose of their holdings and to make an offer of this stock to the public.  **Such a public offering may possess all the dangers attendant upon a new offering of securities.  Wherever such a redistribution reaches significant proportions, the distributor is treated as equivalent to the original issuer and, if he seeks to dispose of the issue through a public offering, he becomes subject to the act.**

Pennaluna & Co. v. SEC, 410 F.2d 861, 865 n.3 (9th Cir. 1961) (emphasis added) (quoting H.R. Rep. No. 85, at 13-14 (1933)).

Furthermore, the structure of the Act supports the proposition that the registration requirement applies to

---

[9] The use of legislative history, of course, is controversial, and the Court does not embrace the broad statement that legislative history is always relevant.  Regardless of the academic debate, however, courts have looked to this particular House Report in determining the scope of section 5 of the Securities Act.  See Pennaluna & Co. v. SEC, 410 F.2d 861, 865 n.3 (9th Cir. 1961).

[10] Section 2(a)(11) defines "underwriter."  15 U.S.C. § 77b(a)(11).

transactions.  See United Sav. Ass'n of Tex. v. Timbers of
Inwood Forest Assocs., Ltd, 484 U.S. 365, 371 ("A provision that
may seem ambiguous in isolation is often clarified by the
remainder of the statutory scheme . . . because only one of the
permissible meanings produces a substantive effect that is
compatible with the rest of the law.").

The overall structure of the Securities Act registration
requirement is this: Section 5 broadly applies to almost every
security transaction.  Section 4 provides a number of specific
exceptions for which there is no need for registration.  Thus,
instead of specifying the applicability of the requirement by
affirmatively listing specific situations in its operative
provision, i.e., section 5, Congress elected to limit
applicability by enumerating exceptions in a different
provision.  See Lawrence Hammond, Comment, Sale of Control Stock
and the Broker's Transaction Exemption -- Before and After the
Wheat Report, 49 Tex. L. Rev. 475, 476 (1971) ("The
congressional design[,] . . . though not readily apparent upon a
cursory reading of the statute, is accomplished through an
unusual process of selective nonexclusion from the all-inclusive
registration provisions.").  Thus, the applicability of section

5 is dictated by section 4.[11]   Section 4, in turn, exempts transactions, not securities.  15 U.S.C. § 77d.  Because section 4, which in practice determines the scope of the section 5 registration requirement, is transaction specific, section 5 is also transaction specific.  See SEC v. Cavanaugh, 155 F.3d 129, 133 (2d Cir. 1998) (concluding that section 5 applies to transactions and not to securities because section 4 provides exceptions for specific transactions).[12]

Lastly, as noted by the Second Circuit in SEC v. Cavanaugh, multiple cases implicitly hold that the section 5 registration requirement applies to transactions.  155 F.3d at 133 n.18 (listing cases); see also Pennaluna, 410 at 865; Sierra, 712 F.3d at 324-25.  One law review article from 1965 noted that the

---

[11] In other words, by way of example, the structure of the Securities Act is such that the operative provision states, "this requirement applies to all bikes" and another provision states "the operative provision does not apply to Harley-Davidson and Yamaha."  To determine whether the operative provision refers to motorcycles or bicycles (or both), one would look at the provision listing exceptions.  One would think that, because the exception lists particular types of motorcycles, the operative provision refers to motorcycles.

[12] Though **not** noted by the Second Circuit in Cavanaugh, this argument is susceptible to one counter-argument: that section 3 exempts certain securities, not transactions.  See 15 U.S.C. § 77c(a).  Nonetheless, "[s]ection 4 is the heart of the statute." Hammond, supra, at 477.  Furthermore, given that section 4 exempts specific transactions, the most natural inference from the section 3 exemption of securities is that the registration requirement, in a way, applies to both securities and transactions.

registration requirement applies to transactions as well.  Neil Flanagin, <u>The Federal Securities Act and the Locked-In Stockholder</u>, 63 Mich. L. Rev. 1139, 1141 (1965) ("Registration under the [Securities Act] is, in reality, the registration of a transaction in a security and not registration of the security itself.").

For the above reasons, the Court adopts the Commission's position and holds that the registration requirement of section 5 applies to transactions.

**2.   The Summary Judgment Record Demonstrates that Sargent's Transaction was Unregistered**

Here, Sargent failed to register his transaction.  As stated above, his first argument is that he purchased the S-1 shares from the S-1 Shareholders in compliance with Form S-1. Even assuming this is true,[13] mere compliance with Form S-1 as to an initial transaction registered neither Sargent's sales, nor those of Herod and Giordano, to the public.  In other words, in the diagram below, even if Arrow 2 (and Arrow 1) are registered,

_____

[13] The Commission seems to contest this point in the complaint but does not develop it in its memoranda.  <u>See</u> Compl. ¶ 99 ("The sales to Sargent, Giordano, and Herod were not registered . . . ."); <u>see generally</u> Pl.'s Mem.; Pl.'s Reply Supp. Mot. Partial Summ. J.

Arrows 3 and 4 were not.



Sargent's second argument is that he "sold those shares pursuant to the trading transaction exemption."  Sargent's Opp'n 30.  That argument confuses a prima facie element with an exception.  The trading transaction exemption removes transactions not involving underwriters, issuers, or dealers, from the coverage of section 5.  The exemption has nothing to do with whether a prima facie element is met; it is immaterial to whether the transaction was registered.

Thus, the Commission has carried its burden to prove each prima facie element of a section 5 violation.

### B.   The Undisputed Facts Establish that Sargent was an Underwriter

Since the Commission has carried its burden to establish a prima facie case, the burden shifts to Sargent to prove that his sales (and sales by Herod and Giordano) are exempt from

registration.  For the reasons detailed below, Sargent fails to carry this burden.

This subsection proceeds as follows.  In the first and second subsection, the Court explains the holdings of Kern and Sierra.  Third, the Court compares Kern to Sierra.  Fourth, the Court interprets the two cases as establishing a presumption of the middle ground.  Lastly, the Court applies the presumption to this case and concludes that Sargent failed to rebut it.

### 1. <u>Securities and Exchange Commission</u> v. <u>Kern</u>

The Second Circuit case <u>Securities and Exchange Commission</u> v. <u>Kern</u> addressed three similar schemes to complete reverse mergers.  425 F.3d 143, 146 (2d Cir. 2005) (Pooler, J.).  The schemes involved three individuals -- Richard Kern, Donald Kern, and Charles Wilkins (collectively, the "Sellers") -- who variously controlled three companies (the "Issuers") -- Polus, Inc., Citron, Inc., and Electronic Transfer Associates, Inc. ("Polus," "Citron," and "ETA," respectively).  <u>Id.</u>  Each of the Sellers purchased and incorporated one of the Issuers and then distributed the Issuers' stock to his friends and family members (the "Owners"), effectively making the Issuers shell corporations.  <u>Id.</u>

At various times in 1998, Peter Lybrand ("Lybrand") approached the Sellers to purchase ninety percent or more each Issuer's stock (for $150,000 each).  <u>Id.</u>  To make this possible,

the Sellers would re-purchase the shares from the Owners of Polus and Citron, effectuate ten-for-one stock splits, and then sell the re-acquired stock in the public market via a broker. Id. Before this, Lybrand's team would replace each Issuer's officers and directors. Id. Lybrand, critically, would use companies at his direction to purchase his desired shares rather than doing so himself (the "Matched-Order Sales"). Id. The purpose of the Matched-Order Sales (or passing sales through the public markets rather than directly to Lybrand) was to manipulate the market prices and perceptions of the shares. Id. The Sellers retained a small number (about five percent) of the shares. Id.

By January 1999, "the market value of the Issuers had increased dramatically." Id. "The Sellers then sold some of their remaining shares in over-the-counter market transactions (the 'Market Sales'), netting at least $6 million in profits." Id. Below is a summary of these transfers; each arrow represents a transfer of the Issuers' shares. Arrow 2 represents the Matched-Order Sales. Arrow 3 represents the Market Sales.



The ETA sales were structured slightly differently. Unlike in the Polus and Citron sales where all the shares were issued to the Owners at first, seventy-five percent of the ETA shares were issued to Richard Kern and his wife, and twenty-five percent to the Owners. Id. at 147. Thus, only twenty-five percent of the shares were transferred from the Owners to the Sellers. Id. at 152.

"Matched-Order Sales of Polus stock occurred between June 22 and July 14, 1998 . . . [and] Matched-Order Sales of Citron occurred from July 13 to August 18, 1998." Id. at 146-47. ETA's "Matched-Order Sales started on November 4[, 1998] and Transfers [to Lybrand's companies] continued through January 1999." Id. at 147. The Market Sales for all three took place until January 1999. Id.

When the Commission sued the Sellers, the Sellers made two arguments. Id. at 148. First, as to the Polus and Citron transactions, the Sellers argued that they were protected by

Rule 144, id., which in pertinent part provided safe harbor if
(1) one had not been an affiliate within the last three months
and (2) the securities were not acquired from an issuer or
affiliate within the last two years, see id. at 149 (citing 17
C.F.R. § 230.144(k)).[14]   The Sellers argued that they stopped
being "affiliates" when they (1) resigned as officers and
directors, and (2) relinquished "a large controlling interest"
in Polus and Citron stock.   Brief for Appellant at 48, SEC v.
Kern, 425 F.3d 143 (2d Cir. 2005) (03-6235(L)).   Both events
occurred from June to August 1999 at the latest; therefore, they
argued, the Market Sales of Polus and Citron stocks took place
more than three months after defendants were officers.   Id.

    Second, as to the ETA transaction, the Sellers conceded
that they did not qualify for the Rule 144 safe harbor, since
three months had not elapsed from when they (allegedly) stopped
being affiliates; thus, they could only seek excusal by proving
they did not qualify as **underwriters** under section 4(1).   See
id. at 50; see also Kern, 425 F.3d at 152.

    The Second Circuit rejected both arguments.   As to the
Sellers' first argument that Rule 144 safe harbor applied, the
court held that the Sellers did not satisfy the second prong.

---

[14] Rule 144, at the time, provided for a two-year period
rather than the current one-year requirement.   See Kern, 425
F.3d at 148; see also 17 C.F.R. § 230.144(b)(1)(i).

<u>Kern</u>, 425 F.3d at 149-50.  The court noted that "the Sellers dominated Citron and Polus up until only a few months prior to the January and February 1999 Market Sales at issue."  <u>Id.</u> at 149.  In addition, the Sellers also controlled the Owners.  <u>Id.</u> Noting that "control" is broadly defined for the purpose of Rule 144, the court concluded as follows:

> This broad language supports a "control" conclusion, where, as here, the controlling persons so dominated those controlled as to be able to gain upwards of 90% of the stock from Owners who were in a relationship of trust with Sellers.  Indeed, this transaction -- attempting to garner large quantities of closely held companies' stock in anticipation of public distribution -- is exactly the type of transaction for which the Act was intended to require disclosure.  **The proof of control over Owners here rests in the ability of Sellers to garner overwhelming proportions of Citron and Polus' stock at a fraction of the price at which it was sold to Lybrand for distribution.**

<u>Id.</u> at 150 (emphasis added) (citation omitted).  The ability to garner overwhelming proportions the Court said is **sufficient** and yet not necessary to establish control.  <u>Id.</u> at 150 n.3.

**In short, the court held the Owners were affiliates because (1) an "affiliate" is defined as any "person that directly, or indirectly . . . controls, or is controlled by, or is under common control with, such issuer," and (2) the Sellers controlled the Owners and Issuers**.  See <u>id.</u> at 149-50 (quoting 17 C.F.R. § 230.144(a)(1)).  The Sellers' re-purchase of the Owners' shares took place in the summer of 1998, and the Market

[34]

Sales occurred in January of 1999.  Id. at 149-50.  As fewer than two years had passed since "the securities were acquired from . . . an affiliate of the issuer," see 17 C.F.R. § 230.1449(a)(1), when the Sellers sold their shares to the public, the court concluded that the Sellers failed to satisfy the second prong, see Kern, 425 F.3d at 150.

As to the second argument regarding the ETA transaction, the court concluded that the Market Sale involved an underwriter and thus fell outside the section 4(1) exemption.  Id. at 152. Regardless whether the Sellers were underwriters, the court reasoned, Lybrand (or entities controlled by him, to be precise) was an underwriter for the Matched-Order Sales because he acquired the shares from affiliates (the Sellers) with a view to distribution.  Id.  The court then held that "as [] matter of law, the 1999 Market Sales [were] part of the same 'transaction' as the 1998 [Matched-Order] Sales."  Id. at 153.  The court predicated this conclusion on pragmatism, stating as follows:

> Cutting off liability partway through a distribution by a control person would permit a control person to retain some fraction of the profits from such a distribution, thereby encouraging sales made without proper disclosures -- precisely the result that [the Supreme Court in] Ralston Purina instructs us to avoid in interpreting exemptions.

Id. at 153 (citing Ralston Purina, 364 U.S. at 124-25).

**Because (1) the Matched-Order Sales involved an "underwriter," i.e., entities under Lybrand's control, and (2) the Matched-Order Sales (Arrow 2) and the Market Sales (Arrow 3) are "part of the same transaction," the court concluded that the Market Sales involved an underwriter and not exempted by section 4 exemption.  Id. (internal quotation marks omitted).**

Two aspects of <u>Kern</u> are worth noting.  First, the second conclusion as to ETA would have been sufficient to conclude that the Sellers were liable for Polus and Citron as well; regardless whether Rule 144 safe harbor applied (whether the Sellers were underwriters themselves), the Section 4 exemption would not apply because the Market Sales were part of a transaction involving underwriters.  Second, <u>Kern</u> was a summary judgment case; the court affirmed the district court's grant of partial summary judgment for the Commission, concluding that there was no genuine dispute of material fact as to the inapplicability of section 4 to the Market Sales.  See <u>id.</u> at 145.

### 2. Securities and Exchange Commission v. <u>Sierra Brokerage Services, Inc.</u>

In <u>Securities and Exchange Commission</u> v. <u>Sierra Brokerage Services</u>, the Sixth Circuit adopted <u>Kern</u>'s first conclusion -- that the defendant's ability to garner a majority of shares for distribution is evidence of "control" for the purpose of the

Rule 144 safe harbor.   712 F.3d 321, 329 (6th Cir. 2013)
(Batchelder, J.).

Sierra also involved a pump-and-dump-via-reverse-merger
scheme.   One of the defendants and the only defendant on appeal,
Aaron Tsai ("Tsai"), incorporated MAS Acquisition XI Corporation
("MAS XI").   Sierra, 712 F.3d at 324.   MAS XI was a shell
corporation.   Id.   In preparation for a reverse merger, Tsai
"pursued clearing the company's stock for trading on" a public
market.   Id.   To that end, Tsai distributed shares to thirty-
three individuals.   Id.   Not unlike the nominal shareholders
(the Owners) in Kern, most of those shareholders were not third
parties who wanted to invest in the corporation but rather
Tsai's "friends or acquaintances."   Id. at 325.   Tsai eventually
obtained clearance for public trading.   Id.

Tsai then arranged a reverse merger between MAS XI and a
private Chinese Software company called "Bluepoint."   Id.   After
having MAS XI declare a 15-for-1 stock split, Tsai executed a
rather complex transfer of shares to Bluepoint.   Id. at 325-26.

He first "created stock certificates for the thirty-three
shareholders' stock."   Id. at 326.   Tsai then "mailed the
certificate and stock powers" to Michael Markow ("Markow"), who
was an experienced financial consultant helping Tsai with the
reverse merger.   Id. at 325, 326.   Markow sent $100 to each
shareholder notwithstanding the number of shares each had.   Id.

at 326.  Having received wire transfers totaling $250,000 from
the people who worked for Bluepoint ("the Promotors"), Markow
sent Tsai a check for $250,000.  Id. at 325, 326.  Markow
subsequently "ordered that the thirty-three shareholders' stock
be recertified in the names of [the Promotors]."  Id. at 326.
The Promotors then publicly sold their shares in Bluepoint.  Id.
All of this was possible because Tsai had "stock powers" –- he
had obtained the shareholders' signatures in advance to transfer
the shares at his will.  Id. at 325.

Thus, transfers of the stock in Sierra looked like the
following:



Tsai facilitated the first transfer (Arrow 1).  Note that Tsai
himself did not sell any shares to the public directly.

The Sixth Circuit held that the section 5 registration
requirement applied to both transactions (both Arrows 1 and 2).
Id. at 329-30.  The court reached this conclusion in two
deductive steps.

First, the thirty-three shareholders were "affiliates."
Id. at 329.  Relying on Kern, the Sixth Circuit reasoned that

Tsai's ability to "garner overwhelming proportions of [MAS XI's] stock at a fraction of the price at which it was sold" demonstrated his control over the shareholders.  Id. (internal quotation marks omitted).  Furthermore, "[u]nlike the defendants in Kern, who had to purchase stock from shareholders before they could profit from it, all Tsai had to do was employ the stock powers that the thirty-three shareholders had signed in advance of the reverse merger."  Id. at 330.  These two facts, the Sixth Circuit reasoned, showed Tsai's control over the shareholders.  Id. at 329-30.  Since the shareholders were controlled by Tsai, they were affiliates.  Id.

Second, because (1) the Promotors acquired and sold the shareholders' –- and thus the affiliates' –- stock in 2000, id. at 325-26, and (2) they did so with a view to distribution, id. at 326, the Promotors were "underwriters," id. at 330.  Since the Promotors were underwriters, the registration requirement of section 5 applied to both transactions –- that is, to both Arrows 1 and 2.  Id. at 330.  Accordingly, the court affirmed the district court's grant of summary judgment for the Commission.  Id. at 333.

The Sierra court determined that a defendant could be held liable even if he himself did not sell the securities.  See id. at 328.  Though the Sixth Circuit did not expound upon this, the Commission had briefed the issue.  Corrected Brief of the

Securities and Exchange Commission, Appellee at 32-34, <u>SEC</u> v.
<u>Sierra Brokerage Servs.</u>, 712 F.3d 321 (6th Cir. 2013) (No. 10-
3546).

### 3.   Comparison of <u>Kern</u> and <u>Sierra</u>

<u>Kern</u> and <u>Sierra</u> have two features in common.  First, both
cases concluded that the nominal shareholders that the
defendants used to disperse shares of the shell companies -- the
Owners in <u>Kern</u> and the thirty-three shareholders in <u>Sierra</u> --
were affiliates and thus issuers.  In so holding, both the
Second Circuit and Sixth Circuit emphasized the defendants'
ability to transfer the shareholders' shares virtually at will.
Second, despite holding that the nominal shareholders were
affiliates, neither Circuit held that those controlling the
shell companies -- the Sellers in <u>Kern</u> and Tsai in <u>Sierra</u> --
were underwriters, yet those individuals were still found
liable.  The Courts held so by concluding that (1) those
associated with the acquiring company -- the entities under
Lybrand's control in <u>Kern</u> and the Promotors in <u>Sierra</u> -- were
underwriters; and thus (2) those controlling the shell companies
were still fully liable because (a) their sales to the public
were part of the same transaction as the sales to the
underwriter (as in <u>Kern</u>) or (b) they had indirect involvement in
the underwriter's sales to the public (as in <u>Sierra</u>).

[40]

The Commission invites the Court to adopt the first aspect of Kern and Sierra; the Commission argues that the S-1 shareholders were affiliates because Sargent controlled them, as evidenced by his ability to transfer shares.  Pl.'s Mem. 10. Since Sargent acquired shares with a view to distribution, the Commission insists, he is an underwriter, and the section 4(a)(1) exemption is unavailable to him.  Id.

### 4.  The Court Interprets Kern and Sierra as Establishing the Presumption of the Middle Ground

The Commission argues that like in Sierra and Kern, this case involves a reverse-merger in which the control person of the shell company transfers the shares owned by the nominal shareholders to the acquiring company's control persons.  Pl.'s Mem. 7-8.  It points to specific facts such as Sargent's use of stock powers and BMP's lack of corporate formalities.  Id. 10-11.  Sargent argues that Kern and Sierra are factually distinguishable, and that BMP did have corporate functions. Sargent's Opp'n 19-22.

Both parties' positions involve slicing-and-dicing of Kern and Sierra to some degree.  That is, both parties overemphasize one part of Kern and Sierra and ignore the broader context in which the two cases were decided.  Kern and Sierra do not stand for the grandiose proposition that nominal shareholders are affiliates whenever a person controlling a shell company

[41]

demonstrates "the ability . . . to garner overwhelming proportions of [the nominal shareholders'] stock at a fraction of the price at which it was sold . . . for distribution." Kern, 425 F.3d at 150.  As stated above, the issue of control is usually a question of fact.  Sargent's ability to transfer shares at will is relevant evidence that tends to prove control but does not conclusively establish the point.  By the same token, any minor factual deviations from Kern and Sierra do not make Sargent's ability to move the S-1 shares completely irrelevant.

This Court construes Kern and Sierra much more narrowly. This Court adopts the holdings of these two cases to the extent they support the following two propositions: first, when the Commission demonstrates (a) the defendant's ability to garner shares at a disproportionately low price for a reverse merger or otherwise, and that (b) he indeed sold those shares within a short period of time, the Commission establishes a presumption of the middle ground (or prima facie evidence -- to use a state law term) that the defendant was an underwriter.  To address such a presumption, the defendant must come forward with probative evidence that he did not acquire the shares with a view to distribution.  If he does so, the fact-finder weighs the presumption of the middle ground against such evidence to

determine the issue.[15]  Second, as a corollary to the first

proposition, like a simple presumption, in applying a

presumption of the middle ground, the court can grant summary

_____

[15] A presumption of the middle ground (or prima facie
evidence), "is just like a presumption, except the bubble
doesn't burst."  William G Young, Reflections of a Trial Judge
35 (1998); accord United States v. Jessup, 757 F.2d 378, 382-83
(1st Cir. 1985) (Breyer, J.), abrogated on other grounds by
United States v. O'Brien, 895 F.2d 810 (1st Cir. 1990).  Thus,
even when contrary evidence is presented, prima facie evidence
maintains its force and is accorded any weight that the fact-
finder sees fit.  Jessup, 757 F.2d at 383.

The rationales for the creation of presumptions -- both
simple presumptions and presumptions of middle ground (prima
facie evidence) -- abound.  But the main ones are fairness,
social policy, and probability.  See 2 McCormick on Evidence §
343 (8th ed. 2020).

An example of a presumption based on fairness is "the rule
that as between connecting carriers, the damage occurred on the
line of the last carrier."  Id.  This presumption is created
because of the "imbalance resulting from one party's superior
access to the proof."  Id.  Another example is the presumption
that the employer unlawfully discriminated against the employee
once the employee establishes a prima facie case in the context
of Title VII cases.  See St. Mary's Honor Ctr. v. Hicks, 509
U.S. 502, 506 (1993).  This presumption also exists because of
fairness concerns; it is "difficult to prove what the state of a
man's mind at a particular time is," and thus it is only fair
that the defendant proves that he did not have a discriminatory
intent when the plaintiff put forward circumstantial evidence.
Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716-16
(1983) (quoting Edginton v. Fitzmaurice, 29 Ch. Div. 459, 483
(1885)).  Finally, if a person has disappeared and has been
absent for seven years, that raises a presumption that the
person is dead.  2 McCormick on Evidence § 343.  This
presumption is based on probability and social policy, as well
as fairness.  As a realistic matter, it makes it likely that the
person is dead if no one has heard from him or her for seven
years.  Id.  Additionally, "social policy of enforcing family
security provisions such as life insurance, and of settling
estates" also calls for this presumption.  Id.

judgment for the Commission if the defendant does not come forward with probative evidence to rebut the presumption.

This Court holds that, if the Commission proves the basic facts to support (a) that the defendant acquired shares from nominal shareholders at an extremely low price in comparison to the market value at the time of sale and (b) that the defendant sold the shares shortly after the purchase, this establishes a presumption of the middle ground that the defendant was an underwriter.

The Court interprets Kern and Sierra to support this holding for at least two reasons. First, the usual reasons for creating a presumption, such as fairness, social policy, and probability, apply to determining whether someone is an underwriter. Second, placing the burden of production on the defendant is consistent with Supreme Court and First Circuit precedent regarding summary judgment.

Before discussing each of these rationales for creating a presumption, it is worth noting that this Court does not necessarily accept the other legal holdings, explicit or otherwise, from Kern or Sierra. For example, this Court does not accept Kern to the extent it implies that whether two transfers of stock are one transaction for the purpose of section 5 is matter of law for the judge to determine. The Court also does not accept Sierra to the extent it suggests that

[44]

determining the liability of someone who did **not** sell any shares, but only facilitated a transfer, is matter of law for the judge's consideration.[16] **The Court's ruling only concerns Sargent's sales to the public (Arrow 4), and not those of Herod or Giordano (Arrow 3).**



In other words, in assessing the facts of Sargent's case, the <u>Kern</u> court may have held Sargent liable by concluding Arrow 3 and 4 to be one transaction as matter of law, <u>see</u> 425 F.3d at 153, and the <u>Sierra</u> court may have held that as matter of law Sargent's indirect involvement with sales by Herod and Giordano

---

[16] In fact, most courts have held that this issue is matter of fact for the jury to decide, requiring that the defendant be a substantial and necessary participant in the transaction. <u>See, e.g.</u>, <u>SEC</u> v. <u>Genovese</u>, No. 17 Civ. 5821(LGS), 2021 WL 1164654, at *3 (S.D.N.Y. Mar. 26, 2021) ("[A] question of fact remains as to whether [the defendant] was subject to [s]ection 5 as a 'necessary participant' or 'substantial factor' in the transaction.").

was sufficient to hold him liable for their sales, <u>see</u> 712 F.3d at 328. This Court adopts neither of these rulings.[17]

### a. The Rationales for Establishing a Presumption of the Middle-Ground

The Supreme Court has already created a presumption in the area of securities law. In <u>Basic Inc.</u> v. <u>Levinson</u>, the Court held that a plaintiff may invoke a presumption that investors rely on the market price of a company's security to satisfy the causation element of a section 10(b) claim. 485 U.S. 224, 247 (1988). Section 10(b) of the Exchange Act and its implementing regulation prohibit material misrepresentations and omissions in the sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. One of the prima facie elements that a plaintiff must prove is reliance –- that he or she relied on the

---

[17] The Commission may be seeking disgorgement as to sales by Herod or Giordano; it states the following in its brief:

> This Court **found** that Sargent participated in an illegal, unregistered distribution of PixarBio stock. That distribution included the sale of stock by Sargent, **M. Jay Herod, and Patrick Giordano**. Sargent **orchestrated** this illegal distribution by exercising common control over the stock held by the 32 record shareholders, which stock was delivered to himself, Herod, and Giordano, and finally sold into the public markets by all three.

Pl.'s Mem. Disgorgement Herod Stromsland & Reynolds & Addressing Issues Def.'s Mem. Law 5, ECF No. 210 (emphasis added).

This Court did not "find" such an illegal scheme. This Court only ruled as matter of law that Sargent violated section 5 based on **his** sales to the public, not those of Herod and Giordano.

[46]

material misstatement or omission.  Basic, 485 U.S. at 243.

"The 'traditional (and most direct way)' for a plaintiff to

prove reliance is to show that he was aware of a defendant's

misrepresentation and engaged in a transaction based on that

misrepresentation." Goldman Sachs Grp. Inc. v. Ark. Tchr. Ret.

Sys., 141 S. Ct. 1951, 1958 (2021) (quoting Halliburton Co. v.

Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014)).

    In Basic, however, the Court held that "a plaintiff may

also invoke a rebuttable presumption of reliance based on the

fraud-on-the-market theory." Id.  The fraud-on-the-market

theory undergirding the Basic presumption is that "an investor

presumptively relies on a misrepresentation so long as it was

reflected in the market price at the time of his transaction."

Id. (internal quotation marks omitted) (quoting Erica P. John

Fund, Inc. v. Halliburton Co., 563 U.S. 804, 813 (2011)).  The

Basic presumption has "particular significance" in class actions

since the presumption allows class-action plaintiffs to prove

reliance through evidence common to the class.  Id. at 1958–59.

"To invoke the Basic presumption, a plaintiff must prove (1)

that the alleged misrepresentation was publicly known; (2) that

it was material; (3) that the stock traded in an efficient

market; and (4) that the plaintiff traded the stock between the

time the misrepresentation was made and when the truth was

revealed." Id. at 1958.  The defendant may rebut the

presumption through "[a]ny showing that severs the link between
the alleged misrepresentation and either the price received (or
paid) by the plaintiff, or his decision to trade at a fair
market price." Id. (alteration in original) (quoting Basic, 485
U.S. at 248).

In establishing the presumption, the Supreme Court posited
three reasons.  First, the Court reasoned that it would be
unfair to place the burden on plaintiffs to prove reliance
affirmatively.  The Court noted that "[r]equiring a plaintiff to
show a speculative state of facts, i.e., how he would have acted
if omitted material information had been disclosed . . . or if
the misrepresentation had not been made . . . would place an
unnecessarily unrealistic evidentiary burden on the Rule 10b-5
plaintiff who has traded on an impersonal market." Basic, 485
U.S. at 245.  This, of course, stems from the complex nature of
the stock market, which, "literally involving millions of shares
changing hands daily, differ[s] from the face-to-face
transactions contemplated by early fraud cases . . . ." Id. at
243-44.  Because investors use so many variables and complex
formulas, to expect a plaintiff-investor to show how his formula
would have panned out had one variable changed would be unfair.

Second, the Supreme Court reasoned that "[t]he presumption
of reliance employed in this case is consistent with, and, by
facilitating Rule 10b-5 litigation, supports, the congressional

policy embodied in the 1934 Act." Id. at 245. "In drafting
that Act," the Court postulated, "Congress expressly relied on
the premise that securities markets are affected by information,
and enacted legislation to facilitate an investor's reliance on
the integrity of those markets." Id. at 245-46. In other
words, the presumption of reliance was the theory on which
Congress predicated the Exchange Act. See id.

Third, the Court noted that the presumption "is also
supported by common sense or probability." Id. at 246. Citing
empirical studies, the Court made a commonsense observation that
"the market price of shares traded on well-developed markets
reflects all publicly available information, and, hence, any
material misrepresentations." Id. In other words, "it is hard
to imagine that there ever is a buyer or seller who does not
rely on market integrity." Id. at 246-47 (quoting Schlanger v.
Four-Phase Sys. Inc., 555 F. Supp. 535, 538 (S.D.N.Y. 1982)).
That is to say, in the form of the Court's rhetorical question,
"[w]ho would knowingly roll the dice in a crooked crap game?"
Id. at 247.

All of these three rationales -- fairness as to the burden
of production, legislative intent, and probability -- apply to
the determination of control.

First, it is not only fair to place the initial burden of
production on the defendant to show lack of control, **it is**

[49]

**already the law pronounced by the Supreme Court**.  As stated

above, the Supreme Court has held that once the Commission

establishes a prima facie violation of section 5, the burden

shifts to the defendant to prove that an exemption applies.  See

Ralston Purina, 346 U.S. at 126 ("Keeping in mind the broadly

remedial purposes of federal securities legislation, imposition

of the burden of proof on an issuer who would plead the

exemption seems to us fair and reasonable."); see also Bio Def.,

2019 WL 7578525, at *16.  Thus, the presumption does not even

endow the Commission with any extra aid in terms of the burden

of production –- which perhaps is the greatest weapon that a

presumption generates; it merely helps the Commission establish

control conclusively in one way.[18]

Second, the presumption of control is consistent with the

congressional policy embodied in the Securities Act.  As

discussed above, Congress enacted the Securities Act in response

to the "disastrous collapse in prices of listed stocks in 1929,

and the Great Depression that followed."  Merrill Lynch, 547

U.S. at 78.  By enacting these two statutes, "Congress sought to

eliminate the 'abuses which were found to have contributed to

the stock market crash of 1929 and the depression of the

1930's.'"  Chadbourne & Parke, 571 U.S. at 403 (quoting Capital

---

[18] In this regard, the presumption that this Court
establishes in this memorandum is rather modest.

<u>Gains Rsch. Bureau</u>, 375 U.S. at 186).  The registration
requirement of section 5 and the trading exception under section
4 are predicated on the assumption that issuers, underwriters,
and dealers have unfair insider information not available to the
investing public and make unfair profits.  <u>See</u> <u>M & A West, Inc.</u>,
2005 WL 1514101, at *1 (noting that the section 5 registration
requirement exempts transactions not involving an issuer,
underwriter, or dealer with "the belief being, presumably, that
issuers, underwriters, and dealers (but no one else) have
information superior to that possessed by the public at large").
Given this predicate, that someone could attain shares at an
extremely low price and make extreme profits therefrom -- so low
that no reasonable person would sell them at such a price -- is
strong evidence that the person is someone who has superior
information, i.e., an underwriter.

    Third, the presumption makes sense in terms of probability.
It is highly unlikely that a reasonable shareholder or investor
would sell their shares at an extremely low price -- unless he
or she is controlled by the purchaser.  After all, people
invest in stock to make profits.  Just like "it is hard to
imagine that there ever is a buyer or seller who does not rely
on market integrity," <u>Basic</u>, 485 U.S. at 246-47, it is hard to
imagine that there ever is a buyer or seller who would willingly
give up an opportunity to make profits.

In addition to the three rationales that mirror the ones
mentioned in Basic, one additional rationale for here creating a
presumption of the middle ground is worth noting; the
presumption brings **transparency** and **disciplinary** benefits to the
courts.  As will be discussed below, many courts are prone to
granting summary judgment inappropriately on questions of fact
involving credibility determinations when the facts seem
conclusive to the judges' eyes.  Kern and Sierra superficially
read that way: the opinions suggest that the courts determined a
question of fact -- the issue of control -- because they were
convinced that the defendants controlled the shareholders, thus
affirming the grant of summary judgment.  The defendant in a
future section 5 case may not know what to make of it, but he is
likely to think that (1) control is a question of fact based on
the totality of the circumstances, (2) the price disparity is
**one** relevant factor, and (3) thus showing that the totality of
the circumstances indicate lack of control would be a good
strategy, keeping in mind that the price disparity could be
relevant to the analysis.  In fact, that is what Sargent has
opted to do: he attempts to distinguish Kern and Sierra on a
factual basis, highlighting minor differences between those
cases and this case, such as how much corporate formality BMP
had compared to the shell companies in Kern and Sierra.  See
generally Sargent's Opp'n.

[52]

The presumption crystallizes this Court's thinking process and clarifies what the defendant (and the Commission) must do to survive summary judgment.  The presumption makes clear that the issue of control is matter of fact for the jury but explicitly recognizes that the judge may grant summary judgment if the price disparity is established (and not rebutted).  The defendant would know what he needs to do once that is done: he needs to rebut the presumption, attacking either the basic fact or the resultant fact.  Viewed this way, the presumption leads to a more efficient and transparent determination of control, while preventing the court from substituting its own judgment for the jury's.

For these reasons, the Court holds that a disproportionate disparity between the price at which a defendant acquires shares from nominal shareholders and the price at which he sells them to the public creates a presumption of the middle ground that the defendant controlled the shareholders.

Similarly, when the defendant sold the shares in a short window of time,[19] he is presumed to have acquired shares with a

---

[19] The Court need not here definitively conclude how "short" the interim between the time the defendant purchased the shares and the time at which he sold the shares must be, one year seems to be a good threshold given that this is the Commission's view evinced by Rule 144.  17 C.F.R. § 230.144(b)(1)(i) (providing that a person is not an underwriter if (1) he or she has not been an affiliate for three months and (2) "a period of one year

view towards distribution.  Again, the burden of production is already on him to prove that he is not an underwriter and thus it would not be unfair to create such a presumption.

**b. The Presumption and Relevant Summary Judgment Precedent**

Allowing the Commission here to secure summary judgment using the presumption is consistent with this Court's adherence to <u>Reeves</u> v. <u>Sanderman Plumbing Products</u>, 530 U.S. 133 (2000).

As noted above, "[s]ummary judgment is overused across our courts." <u>EagleEye Asset Mgmt.</u>, 975 F. Supp. 2d at 155; <u>see also</u> <u>supra</u> Section I.  Sensitive to this trend, this Session of the Court has meticulously adhered to the standards set forth in <u>Reeves</u>.  <u>See, e.g.</u>, <u>id.</u> at 157.[20]  In <u>Reeves</u>, the Supreme Court

_____

has elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer.").

[20] Consistent with the quote above, Judge Richard Arnold insisted that if there is any room for a jury to decide otherwise, the court ought not grant summary judgment.  <u>See</u> <u>Stanback</u> v. <u>Best Diversified Products, Inc.</u>, 180 F.3d 903, 912 (8th Cir. 1999) (Arnold, J., concurring).  Judge Arnold argues that as long as the plaintiff produces some evidence that would justify a jury's finding in her favor, that would be enough to survive summary judgment:

> In my view, once the plaintiff has introduced evidence which, if believed, would justify a rational jury in finding [in favor of the plaintiff], the plaintiff will always (with an exception not here relevant) be able to survive summary judgment, or to get her case to the jury, as the case may be.  In other words, evidence of pretext would, in and of itself, justify the ultimate finding, which the trier of fact must always make . . . .

<u>Id.</u>

held that the party bearing the burden of proof at trial cannot

secure judgment as matter of law simply because the opposing

party does not present contrary evidence.  <u>Reeves</u>, 530 U.S. at

148-49.  This is because the fact-finder could disbelieve the

proffered evidence.  <u>See</u> <u>EagleEye Asset Mgmt.</u>, 975 F. Supp. 2d

at 157 (citing <u>Reeves</u>, 530 U.S. at 151).

The standards for summary judgment when **the non-moving**

**party bears the burden of production on the issue**, such as here,

are slightly different.  First, "a party seeking summary

judgment must, at the outset, inform the court 'of the basis for

[its] motion and identif[y] the portions of the pleadings,

depositions, answers to interrogatories, admissions, and

affidavits, if any, that demonstrate the absence of any genuine

issue of material fact.'"  <u>Irobe</u> v. <u>U.S. Dep't Agric.</u>, 890 F.3d

371, 377 (1st Cir. 2018) (alteration in original) (quoting

<u>Borges ex rel. S.M.B.W.</u> v. <u>Serrano-Isern</u>, 605 F.3d 1, 5 (1st

Cir. 2010)).

Once the movant "crosses this modest threshold, the

nonmoving party must, with respect to each issue on which [it]

would bear the burden of proof at trial, demonstrate that a

trier of fact could reasonably resolve that issue in [its]

favor."  <u>Id.</u> (internal quotation marks omitted); <u>see also</u> <u>FDIC</u>

v. <u>Elder Care Servs. Inc.</u>, 82 F.3d 524, 526 ("[I]f a party

resists summary judgment by pointing to a factual dispute on

which it bears the burden at trial, that party must point to evidence affirmatively tending to prove the fact in its favor." (citing <u>Celotex Corp</u> v. <u>Catrett</u>, 477 U.S. 317, 322-23 (1986)). In other words,

> The nonmovant must point to materials of evidentiary quality, and such materials must frame an issue of fact that is more than merely colorable. Put another way, summary judgment is warranted if a nonmovant **who bears the burden on a dispositive issue** fails to identify significantly probative evidence favoring his position.

<u>Id.</u> (emphasis added) (internal quotation marks and citations omitted).

To reiterate, once the Commission establishes the prima facie elements of section 5, the burden of production shifts to the defendant to show that an exemption applies. See <u>Ralston Purina</u>, 346 U.S. at 126.[21]

Applying the First Circuit's summary judgment framework to <u>Kern</u> and <u>Sierra</u>, the Court holds that the presumption operates in the following way. When the Commission moves for summary judgment on whether the defendant controlled the shareholders, the Commission satisfies its initial burden to "inform the court of its basis for its motion" when it demonstrates the defendant's ability to garner shares from nominal shareholders at a disproportionately low price. See <u>Irobe</u>, 890 F.3d at 377.

---

[21] This is true regardless of the presumption of the middle ground.

Once the Commission "crosses this modest threshold," id., the burden of production shifts to the defendant to show that the defendant did not control the shareholders.

This holding is consistent with this Court's previous interpretation of Reeves.  In another case, when the Commission moved for summary judgment on an issue **on which the Commission has the burden of production**, this Session of the Court declined to grant it.  See EagleEye Asset Mgmt., 975 F. Supp. 2d at 157, 159-60.  There, the Commission moved for summary judgment on its claims under section 10(b) and rule 10b-5.  Id. at 154.  The Court carefully followed Reeves, id. at 157 ("This Court adheres meticulously to the standard set forth in Reeves . . . ."), and rejected the Commission's motion, id. at 159-60, 163.

In doing so, the Court emphasized two things.  First and foremost, the Court noted that Reeves was based on the actuality that the jury could disbelieve even uncontradicted evidence. See id. at 157 ("[A]t summary judgment, courts must ignore even uncontradicted evidence from disinterested witnesses **where there is some question whether this evidence may be impeached.**" (emphasis added)); see also Conley v. Roseland Residential Tr., 442 F. Supp. 3d 443, 453 (D. Mass. 2020) ("[T]he party bearing the burden of proof at trial cannot secure judgment simply because the opposing party does not present contrary evidence. **This is because the fact-finder could disbelieve the proffered**

[57]

**evidence**." (emphasis added)), <u>cert. granted</u>. Second, the Court noted that "the SEC moved for offensive summary judgment. Thus, the burden of proof for all elements of all claims was on the SEC." <u>Id.</u> at 157. Thus, the Court interpreted <u>Reeves</u> to stand for a commonsense proposition that the party who has the burden at trial cannot secure summary judgment by presenting affirmative evidence merely because the evidence is uncontradicted. In practice, this prevents resourceful, well-prepared defendants from securing summary judgments against plaintiffs.

Neither of these two features underlying <u>Reeves</u> are present here in applying the presumption discussed above at the summary judgment stage. First, the burden of production, to reiterate, is on the defendant; he must produce evidence reasonably suggesting that an exemption applies. Second, though the basic fact -- the price disparity -- **could** turn on witnesses' credibility, the presumption does not turn on such a thing in general: it only depends on the mathematical difference between the price at which the defendant purchased the shares and the price at which the defendant sold the shares to the public. Therefore, the presumption is consistent with <u>Reeves</u>.

A few caveats should be noted. First, consistent with <u>Reeves</u>, if there are genuine disputes about the basic fact itself, i.e., the price disparity, the presumption does not

justify granting summary judgment.  In other words, if the determination of the price disparity depends on a witness' credibility (e.g., the nominal shareholder's testimony), then the presumption does not allow for accepting the resultant fact as undisputed, i.e., the defendant's control, and the court ought not grant summary judgment on the basis of the presumption.

Second, by the same token, the defendant can challenge the resultant fact, i.e., his control.  If such a challenge is based on non-conclusory, genuine factual evidence, the presumption does not warrant summary judgment.  One such example, of course, is that the issuer's market value skyrocketed for a non-suspicious reason, such as a break-through invention by the issuer.  Thus, although it is generally unlikely, if the defendant can attribute the price disparity to something other than his control (such as the issuing company's sudden triumph), he can avoid the Commission's summary judgment even on a showing of a disproportionate price disparity.

Third, the degree to which the defendant's rebuttal evidence has to be probative in order to survive the Commission's motion for summary judgment is a relatively low bar.  Though the defendant's evidence must be, in Judge Selya's words, "more than the frenzied brandishing of a cardboard sword," Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014),

what is required is only that the evidence makes it possible for a reasonable jury to find for the defendant, Hope Furnace Assocs, Inc. v. FDIC, 71 F.3d 39, 42-43 (1st Cir. 1995) ("[It is] sufficient . . . to permit a reasonable jury to resolve the point in the nonmoving party's favor.").

> **5.  Sargent Fails to Carry his Burden to Provide Probative Evidence to Rebut the Presumption**

Here, Sargent's congeries of conclusory factual statements are, indeed, nothing but "the frenzied brandishing of a cardboard sword."  Geshke, 740 F.3d at 77.  Sargent floods this Court with a plethora of irrelevant facts in his memoranda designed to illustrate his lack of scienter for the section 10(b) claim, which is not the subject of the pending summary judgment motion.[22]  Even viewed in the light most favorable to him, none of them reasonably can be viewed as "probative evidence," See generally Sargent's Opp'n, contradicting his control over the S-1 Shareholders.  On that score, Sargent offers only one isolated tidbit.  See Sargent's Resp. Facts 7.  Even that piece is insufficient.

---

[22] Scienter is not an element of a section 5 claim, let alone relevant to whether an exemption applies.  See, e.g., SEC v. Jones, 300 F. Supp. 3d 312, 315 n.5 (D. Mass. 2018) (Stearns, J.) ("Scienter is not a required element for civil liability under [s]ection 5 . . . .").

Most of the facts propounded by Sargent are not material
and do not deserve in-depth discussion.  For example, Sargent
insists that BMP was not simply a vehicle for a reverse merger.
Sargent's Opp'n 19, 21.  He maintains that Sargent had genuine
passion for yoga, and he attempted to run a successful yoga
studio through BMP.  Sargent's Opp'n 2-5.  That may be true, but
it does not concern Sargent's control over the S-1 Shareholders.
Sargent laments that the Commission "ignores that Randolf W.
Katz, a lawyer with decades of securities experience, will
provide testimony at trial that Sargent's operation of his
business, as a sole director and officer, was typical of such a
business and not an indication of any wrongdoing." Id. 27.  As
the First Circuit has explicitly stated, "a mere promise to
produce admissible evidence at trial does not suffice to thwart
the summary judgment ax." Garside v. Osco Drug, Inc., 895 F.2d
46, 49 (1st Cir. 1990) (affirming grant of summary judgment
where the nonmovant attempted to manufacture a disputed fact by
stating that an expert would testify at trial).  Thus, not only
is BMP's corporate formality irrelevant, but also Sargent fails
properly to establish it.

By the same token, Sargent's contribution to BMP of
"working capital and loans well in excess of $200,000" is
irrelevant.  Sargent's Opp'n 10.  The dispositive question is
whether Sargent controlled the S-1 Shareholders, and while

whether BMP was a functioning company or a nominal company designed for a reverse merger may be relevant to the fraud claim under section 10(b), it is irrelevant to the section 5 claim that is pending before this Court.

Sargent also insists that he "received approximately $.02 per share . . . the same per-share amount that the S-1 Shareholders received." Id. 21, 26. That may be true, but it does not change the shocking disparity between the price at which Sargent purchased his shares from the S-1 Shareholders and the price at which he sold some of those shares to the public. The reason why the price disparity tends to prove control is because the shareholders are unlikely to sell shares at such a low price when the market value of those shares is high; they are unlikely to give up their opportunity to sell their shares for profit unless they are controlled by the purchaser. Thus, the mere fact that Sargent purchased the shares at the price at which the S-1 Shareholders acquired them is of little importance.

Sargent's assertion that only four of the S-1 Shareholders were his family members and close friends and thus could be under his control is also meritless. Sargent's Opp'n 5. He does not point to any authority, and this Court cannot find any, that one must be a family member or friend of the defendant to be under his control. Although one's relationship to the

[62]

defendant could be relevant, simply pointing out that only four
of the thirty-two S-1 Shareholders were Sargent's family members
and friends is not sufficient to pass even the relatively low
summary judgment hurdle.

Sargent does, however, adduce one fact that could
potentially be probative of his lack of control over the S-1
Shareholders.  Sargent propounds that "[s]everal shareholders
testified that they were aware that BMP was filing and had filed
an S-1, that a stock symbol had been issued, and that they had
the opportunity to sell their shares to the public."  Sargent's
Resp. Facts 7.  The Commission understandably -- because Sargent
adduces so many irrelevant facts and this assertion was buried
in them -- does not respond to this point.  See generally Pl.'s
Reply Supp. Mot. Partial Summ. J.

Though the S-1 Shareholders' awareness of their ability to
sell their shares to the public may ostensibly seem probative of
lack of Sargent's control, it is irrelevant as matter of law.
As discussed above, control is determined by whether Sargent had
"possession . . . of the power to direct or cause the direction
of the management and policies" of an individual or entity.  17
C.F.R. § 230.405.  Thus, that some of the S-1 Shareholders were
aware that their shares would become public is a statement of
subjective belief not relevant to the issue of control because
they do not concern Sargent's **power** to direct a transfer of

[63]

their shares.  See SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1089 (9th Cir. 2010) (holding that statements of subject intent are irrelevant to the issue of control **as a matter of law** because "they do not address [the defendant's] **power** to direct the actions of [the controlled entity] . . . ." (emphasis added)).  This is particularly true **because a section 5 violation is a strict liability offense**.  See, e.g., SEC v. Jones, 300 F. Supp. 3d 312, 315 n.5 (D. Mass. 2018) (Stearns, J.) ("Scienter is not a required element for civil liability under [s]ection 5 . . . .").

Since none of the facts that Sargent proffers is sufficient to rebut the resultant fact of the presumption, i.e., his control, he can only rebut the presumption by attacking the basic fact: the price disparity.  On this score, however, he effectively admits that he garnered shares from the S-1 Shareholders at $0.02 or at $0.10 when the market value of the stock became $30 in less than four months.  See Sargent's Resp. Facts 11-12 (not objecting to the SEC's statement that he purchased the shares at $0.01 per share); id. 14, 16 (not objecting to the statement that he sold his shares at $30 while denying he made as much of a "significant profit" as the SEC alleges because he paid for an amount in "operating the studio and BMP"); Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (noting that under a local rule, facts in the

[64]

statement of material facts not controverted by the non-moving party are deemed admitted); Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003) (applying the same local rule).

Thus, Sargent fails to carry his burden to proffer probative evidence refuting his control over the S-1 Shareholders.  Accordingly, the Court holds that there is no genuine dispute as to his control.

## VI.  CONCLUSION

"Justice can be attained only by a careful regard for fundamental facts," Justice Brandeis said, "since justice is but truth in action."[23]  The presumption of the middle ground will transform a somewhat nebulous legal pronouncement by circuit courts into a practical guide on how to apply it to summary judgment motions.  If the Second Circuit and Sixth Circuit have pronounced the "truth" about how to interpret the trading exemption under section 4, this Court strives to put it in action by applying it with the help of the presumption.

For the aforementioned reasons, the Court granted the Commission's motion for partial summary judgment, ECF No. 144. See Electric Clerk's Notes, ECF No. 189.  The Commission has established a prima face case, and Sargent has failed to

---

[23] Louis D. Brandeis, Business: A Profession 320 (1925).

demonstrate with probative evidence that a reasonable jury could

find that the trading exception applies.


                                        /s/ William G. Young
                                        WILLIAM G. YOUNG
                                              JUDGE
                                             of the
                                        UNITED STATES[24]

---

[24] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.