UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HENRY B. SARGENT, )<br>)<br>Defendant. )<br>) | Case No. 19-CV-11416 (WGY) |

**SEC'S OPPOSITION TO MOTION FOR NEW TRIAL
AND MOTION TO STRIKE ESKANDAR AFFIDAVIT**

On April 4, 2022, the jury returned a unanimous verdict finding Henry Sargent liable on all fraud claims. After the Court recorded the verdict and discharged the jury, Sargent's counsel requested that the Court poll the jury. This request did not meet the requirements of Fed. R. Civ. Proc. 48(c), and the Court denied it. Rather than press the issue or ask the Court to reconvene the jury to poll them, defense counsel apparently dispatched at least one member of Sargent's legal team to question jurors privately about their internal deliberations, without notice to the Commission or the Court. This conduct violated First Circuit law, the rules of professional conduct, and this Court's express admonition that the parties were not permitted to contact any juror.

Sargent now seeks to leverage his attorneys' misconduct in a last-ditch effort to overturn the jury's unanimous verdict and obtain a new trial. The Court should reject his attempt to do so. If the Court erred in denying Sargent's request to poll the jury, that error was harmless. All evidence properly before the Court indicated the jury verdict was unanimous. Although Sargent suggests otherwise, his claims are based on second-hand reports about the internal deliberations of the jury that are inadmissible and cannot be received by this Court under Federal Rules of

Evidence.  Moreover, defense counsels' own misconduct tainted they jury and thereby foreclosed the obvious remedy for the error they now allege—recalling the jurors to poll them. Accordingly, the Commission respectfully requests that the affidavit in support of Sargent's motion (Dkt No. 243-1) be stricken, and that his motion for a new trial (Dkt No. 243, with supplemental memorandum, Dkt. No. 264) be denied.

I.       Background

At approximately 12:15 p.m. on April 4, 2022, the jury in this matter returned a unanimous verdict, finding Sargent liable on all fraud-based claims brought by the Commission. *See* Dkt No. 256; April 4, 2022 Tr. at 8.  The Court asked the Foreperson whether the jury reached a unanimous verdict; the Foreperson responded, "Yes." (April 4, 2022 Tr. at 8).  The Court then instructed the jury to stand and listen to the verdict as the Court read it.  (*Id*. at 8). The Court read each question and the jury's affirmative responses as reflected on the verdict form.  (*Id*. at 8-9.)  The Court then confirmed the unanimous verdict and collectively polled the jury:

> The CLERK:  . . . So say you Madam Forelady, is that your verdict?
>
> THE FOREPERSON:  Yes.
>
> THE CLERK:  So say you members of the jury?
>
> THE JURY:  (In unison.) Yes.

(*Id*. at 9, ln. 5-8).

The Court thanked the jurors for their service, and stated on the record and in the presence of the jury, all parties, and their respective legal teams:

> This case is now over.  Under the rules of court, nobody involved in the case -- certainly not the Commission or any of its agents, no one for Mr. Sargent, none of the lawyers, none of them can contact you, it would be a violation of the rules of court. And they -- it doesn't happen.  That's not going to happen.

2

(*Id*. at 9, ln. 16-21).

After urging the jurors not to discuss internal deliberations, the Court told the jury:

> Now I'd like to come back and just thank you personally. I need to schedule another date with the lawyers. So if you'll just wait for me for one moment. The jury may retire. I'll remain on the bench.

Only then, after the Court discharged the jury, but before the jury physically left the courtroom, did counsel for Mr. Sargent ask: "Can we poll the jury?" The Court responded: "Denied. They may be excused." (*Id.* at 10, ln. 13-15).

The Court remained on the bench for several minutes to address scheduling matters and to address Sargent's oral motion for judgment notwithstanding the verdict. (*Id.* at 10-12).

Shortly thereafter, Ms. Natasha Eskandar, a paralegal and part of Mr. Sargent's legal team who was present during the proceedings described above, interviewed five jurors regarding their internal deliberations and attempted to interview a sixth, all inside the courthouse. *See* Dkt No. 243-1 (Affidavit of Natasha Eskandar). Ms. Eskandar's affidavit is silent as to how contact was initiated; whether anyone else was present during her questioning; whether any other member of the legal team participated in the questioning; who directed her to engage in such questioning; and the specific location, duration, and manner of her questioning, among other matters.

At 8:46 a.m. on Tuesday April 5th—after Ms. Eskandar had already conducted the defense team's own unsupervised interview of several jurors—Sargent's counsel informed the Commission by email that they believed the Court had committed reversible error by denying his motion to poll the jury. Sargent's counsel did not disclose in that email that Sargent's legal team had already improperly questioned jurors. Later that day, the Commission conferred by telephone with Sargent's counsel, and the Commission stated its view that the error, if any, could

3

be cured by recalling the jury to conduct a further poll. Sargent's counsel disagreed with that position. The Commission stated its intention to file a motion asking the Court to recall the jury to conduct the individualized poll that defendant contended was necessary. At no time during the call, which lasted approximately 14 minutes, did Sargent's counsel inform the Commission that they had already spoken to several jurors in search of their own evidence. Nor did Sargent's counsel inform the Commission that they intended to file a motion for a new trial that would be based, in part, on their communications with jurors.

The Commission filed an "Emergency Motion to Recall Jury to Conduct Individual Polling" the afternoon of April 5th. Dkt No. 241. Based on its conversation with Sargent's counsel, the Commission represented that "Mr. Sargent does not join this motion and intends to file his position tomorrow." The Court denied the motion later that day. Dkt No. 242. The Commission first learned of the Sargent's interviews of multiple jurors when Sargent filed his motion for a new trial on April 6, 2022, at 5:35 p.m. Dkt No. 243. Based on the accompanying affidavit from Ms. Eskandar describing what jurors purportedly said about their internal decision process and descriptions of jury deliberations, Sargent argued that these *ex parte* juror interviews provided "substantial reason to believe that the jury failed or declined to follow the Court's instructions and that the verdict was not truly unanimous." *Id.* at 3. The motion and supporting affidavit were filed on the public docket.

On the evening of April 6, 2022, Law360 published an article online regarding Sargent's motion. *See* https://www.law360.com/articles/1481668/atty-says-failure-to-poll-jury-in-sec-suit-warrants-new-trial (last accessed April 18, 2022). The article quoted portions of Ms. Eskandar's affidavit and attached the motion and supporting affidavit, as well as the SEC's motion to recall the jury to conduct further polling. *Id.*

On April 8, 2022, Sargent filed a "Supplemental Submission in Support of Motion For a New Trial Pursuant to FRCP 48(c)." Dkt No. 264. That filing raised for the first time an alleged defect in the verdict form and described counsel's perceptions regarding "the demeanor of many of the jurors." *Id.* at 2.

II.     Failure To Poll Individually Is Not a Per Se Error That Requires a New Trial.

There is no merit to Sargent's argument that the Court committed *per se* reversible error in failing to poll the jury after it rendered its unanimous verdict against him. Contrary to Sargent's claims, the First Circuit has expressly declined to conclude that a failure to conduct a jury poll automatically serves as a basis for a new trial. *Ira Green, Inc.*, 775 F.3d 12, 25 (1st Cir. 2014). Rather, as Sargent fails to elucidate in his motion for a new trial, whether a polling error is *per se* reversible or instead subject to a harmless error analysis is a "gray area [that is] left unexplored" in this Circuit. *Ira Green, Inc.*, 775 F.3d at 25. Sargent is incorrect that the Seventh Circuit's decision in *Verser v. Barfield*, 741 F.3d 734 (7th Cir. 2013) "squarely addressed the question whether failure to follow the mandatory language of Civil Rule 48(c) is *per se* reversible error." On the contrary, the *Verser* court explained it was sitting in review of "the distinct question whether Rule 48(c) requires that the court ensure that a party is somehow able to make a polling request after the verdict is read." *Id.* at 739. And, while the *Verser* court did reverse, it did so only after having applied a harmless error analysis to that issue. *Id.* at 743.

As the First Circuit explained in *Ira Green*, numerous state courts interpreting similar mandatory jury-polling rules have concluded that "a violation of the right to a jury poll engenders automatic reversal in criminal cases but not in civil cases." *Ira Green*, 775 F.3d at 25 (citing, *inter alia*, *Wiseman v. Armstrong*, 989 A.2d 1027, 1038 & n.18, 1040-41 (Conn. 2010) (collecting cases)). Those state courts instead review "a trial court's failure to conduct a

5

requested jury poll in a civil case for harmless error." *Ira Green*, 775 F.3d at 25 (citing *Wiseman*, 989 A.2d at 1040-41).

There are good reasons for distinguishing between civil and criminal cases in this regard. First, the *Wiseman* court notes, among things, that there is no rule or practice that requires an appellate court to apply a particular standard of review in civil cases, even when reviewing for structural error. 295 Conn. at 109-110. And, although generally a right to poll a jury exists, "[i]t is not a matter which is vital, is frequently not required by litigants, and while it is an undoubted right of either, it is not that which must be found in order to make a valid verdict." *Humphries v. District of Colombia*, 174 U.S. 190, 194 (1899); *see also Jaca Hernandez v. Delgado*, 375 F.2d 584, 585 (1st Cir. 1967) (jury poll is not of constitutional dimension). For these reasons, the *Wiseman* court held that "[t]here are thus no constitutional or statutory grounds that encourage us to adopt per se reversible error." *Wiseman*, 295 Conn. at 112. The same is true here.

The Constitutional dimension, in particular, is quite different in criminal and civil cases. *See, e.g.*, *Foucha v. Louisiana*, 504 U.S. 71, 93 (1992) (Kennedy, J., dissenting) (noting that a "heightened due process scrutiny" is given to criminal cases.). Indeed, "[c]riminal litigation, which adjudicates guilt and liberty, is inherently and functionally distinct from civil litigation, which incorporates notions of equity." *Wiseman*, 295 Conn. at 118 (citing *Foucha*, 504 U.S. at 93). Consequently, "[m]ore than one state court, interpreting similar parallel mandatory jury-polling rules, has concluded that a violation of the right to a jury poll engenders automatic reversal in criminal cases but not in civil cases." *Ira Green, Inc.*, 775 F.3d at 25; *see also Redo y CIA v. First National Bank*, 200 Cal. 161, 167 (1926) ("Assuming that error was committed by the trial court in refusing the appellant's request for a poll for the jury, we think no prejudice resulted therefrom . . . ."); *Roth v. Meeker*, 72 Ill. App. 3d 66, 79-80 (1979) (trial court's refusal to poll the jury to determine whether jurors were influenced by newspaper articles did not constitute

6

reversible error); *Walton Construction Co. v. MGM Masonry, Inc.*, 199 S.W.3d 799, 806 (2006) (refusing to hold that failure to poll the jury in a civil case constitutes per se reversible error; noting that reversal is not required where refusal was not prejudicial); *Martello v. Darlow*, 151 Mont. 232, 235-36 (1968) (lower court abused discretion in granting new trial on ground that it improperly refused a request for a jury poll since any error was harmless); *Ragusa v. Lau*, 119 N.J. 276, 283-84 (1990) (failure to conduct poll in correct manner subject to harmless error); *Levine v. Gallup Sand & Gravel Co.*, 82 N.M. 703, 704 (1971) ("the mere failure to poll the jury upon proper request does not in itself constitute reversible error"); *Suggs v. Fitch*, 64 S.W.3d 658, 661 (Tex. App. 2001) ("Failure to separately and individually poll each jury is subject to harmless error analysis").

Consequently, and contrary to Sargent's argument, this is a matter of first impression for the Court. Even if the Court were to determine that its denial of Sargent's motion to poll the jury was made in error, the Court should apply a harmless error analysis as numerous other courts have done. *See Wiseman*, 295 Conn. at 104-121. Under that standard, the facts demonstrate that any perceived error was harmless. *See* Section V, *infra*.

III.     Defendant Failed To Meaningfully and Timely Pursue His Objection.

Federal Rule of Civil Procedure 48(c) provides that "After a verdict is returned but *before the jury is discharged*, the court must on a party's request . . . poll the jurors individually." (emphasis added). Sargent's motion is premised on the assumption that his polling request was timely under Rule 48(c). The record establishes that it was not. Only after the Court recorded the verdict, thanked the jury, and discharged them, stating "The jury may retire," did Sargent request that the jury be polled. The Court denied the request, and the jury filed out of the courtroom.

7

The dismissal of the jury did not forever foreclose individual polling as a discretionary matter.  Indeed, there is no question that courts have the inherent authority to recall juries after they have been discharged, particularly where the jury has remained sequestered and remains within steps of the courtroom.  *See Dietz v. Bouldin*, 579 U.S. 40, 51 (2016).  As the Supreme Court explained:  "[T]here is nothing about the jury as an entity that ceases to exist simply because the judge tells the jury that they are excused from further service.  A discharge order is not a magical invocation. It is an order, like any other order. . . . There is no benefit to imposing a rule that says that as soon as a jury is free to go a judge categorically cannot rescind that order to correct an easily identified and fixable mistake, even as the jurors are still in the courtroom collecting their things." *Id.* at 53; *cf. Ira Green, Inc.*, 775 F.3d at 26 (noting that counsel could have renewed his request to poll the jury while the jury remained assembled outside the courtroom waiting for the judge to personally thank them).

But Sargent's counsel never asked the Court to recall the jury for that purpose.  They made no effort to obtain the reason for the Court's denial of his request.  Nor did they timely inform the Court that they believed the Court's ruling was error that required a new trial.  And when the SEC proposed recalling the jury for an individual poll the next day, Sargent's counsel refused to join the motion.

Sargent's counsel not only failed to request an immediate recall, but immediately and unilaterally—in violation of law and in violation of this Court's explicit instruction—irretrievably tainted the jury and rendered unrepairable the purported "error" upon which Sargent now stakes his effort to overturn the jury's verdict.  Unbeknownst to the Commission—and undisclosed by Sargent—Sargent's counsel had already surreptitiously questioned jurors on their own, soliciting information about jury deliberations in violation of First Circuit law, the rules governing their conduct in this Court, and this Court's express instruction.  By the time the SEC

8

proposed its remedy, Sargent's counsel had already tainted the jury through improper communications with those jurors about jury deliberations. *See Dietz*, 579 U.S. at 50 (among the factors the court should consider in recalling a jury is "whether the jurors have spoken to anyone about the case after discharge.  This could include court staff, attorneys and litigants, press and sketch artists, witnesses, spouses, friends, and so on.  Even apparently innocuous comments about the case from someone like a courtroom deputy such as 'job well done' may be sufficient to taint a discharged juror who might then resist reconsidering her decision.").

IV.     <u>Defendant's Unsupervised Communications with Jurors Were Improper.</u>

For more than 35 years, the First Circuit has barred parties from contacting jurors post-verdict without Court approval and supervision, and has further required that such Court-supervised contact occur only in "extraordinary situations":

> [H]enceforth this Circuit prohibits the post-verdict interview
> of jurors by counsel, litigants or their agents except under the
> supervision of the district court, and then only in such
> extraordinary situations as are deemed appropriate.

*United States v. Kepreos*, 759 F.2d 961, 967 (1st Cir. 1985).  Since its announcement, this rule has been applied without exception across criminal and civil cases in this Circuit.  *See, e.g.*, *Lydon v. T & N Ltd.*, No. 12-cv-10013-FDS, 2014 WL 2998987, at *1 (D. Mass. July 1, 2014) (applying "extraordinary situations" test to deny civil defendant's application to interview jurors post-verdict); *Cool Light Co. v. GTE Prod. Corp.*, 832 F. Supp. 449, 464-65 (D. Mass. 1993) (finding *Kepreos* barred juror contact with civil plaintiff attorney where contact was solicited by plaintiff's agent); *Bushkin Assocs., Inc. v. Raytheon Co.*, 121 F.R.D. 5, 8 (D. Mass. 1988) (disqualifying civil plaintiff's new trial counsel who interviewed jurors following previous mistrial).

Sargent's counsel offer no recognition of or explanation for their violation of this rule. As officers of the Court, Sargent's counsel have a responsibility to understand the law of this

Circuit regarding juror contact and to comply with it.  Addressing an attorney's improper post-verdict contact with jurors, Judge Keeton explained:

> [The attorney's] conduct exceeded the bounds of conduct permitted of an officer of the court.  His failure to know those bounds is no excuse.  If he knew in general about the First Circuit's firm rule on this subject and thought he had arguable grounds that his proposed course of conduct was not a violation, his failure to bring the matter to the attention of the court and seek court authorization for contact with jurors was inexcusable.

*Cool Light Co.*, 832 F. Supp. at 465.

Sargent's counsel cannot profess ignorance of this long-standing rule because the Court explained it to the all members of Sargent's legal team (along with the Commission and the jury).  The Court expressly stated that for *anyone* involved in the case to contact jurors "would be a violation of the rules of court. . . .  That's not going to happen."  But it did happen.

This violation is not a procedural misstep.  The principles implicated in protecting juror from one-sided, suggestive, and potentially harassing questions are both important and well-established.  "Permitting the unbridled interviewing of jurors could easily lead to their harassment, to the exploitation of their thought processes, and to diminished confidence in jury verdicts, as well as to unbalanced trial results depending unduly on the relative resources of the parties." *Kepreos*, 759 F.2d at 967 ("Such outcomes, or even the appearance of the same, we are not willing to tolerate."); *cf. United States v. Doherty*, 675 F. Supp. 719, 724 (D. Mass. 1987) (Young, J.) ("This Court has the power, and the duty, to prevent juror harassment after the trial. The Court also notes that '[t]he State has a similar interest in protecting juror privacy, *even after trial*—to encourage juror honesty in the future—that almost always will be coextensive with the juror's own privacy interest.'" (internal citations omitted) (emphasis in original)).

The problem is compounded when a party attempts to leverage such unlawful jury contacts to upend a verdict, as Sargent attempts to do here.  As noted above, the Federal Rules of

10

Evidence expressly prohibit testimony from jurors "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  Fed. R. Evid 606(b).  This rule, which Sargent has ignored, exists because "the mental operations and emotional reactions of jurors in arriving at a given result would, if allowed as a subject of inquiry, place every verdict at the mercy of jurors and invite tampering and harassment."  Fed. R. Evid 606(b) (Note to Subdivision (b) of 1972 Proposed Rules).  As the First Circuit has explained, "the rule itself is rooted in a longstanding concern about intruding into jury deliberations and the problems that would be caused if jury verdicts could be easily undermined by post-judgment comments volunteered by (or in some cases) coaxed from jurors with second thoughts."  *United States v. Villar*, 586 F.3d 76, 88 (1st Cir. 2009)*; see also United States v. Connolly*, 341 F.3d 16, 34 (1st Cir. 2003) ("There are significant policy considerations underlying such a rule, including finality, maintaining the integrity of the jury system, encouraging frank and honest deliberations, and the protection of jurors from subsequent harassment by a losing party.").[1]

Sargent's legal team questioned some (apparently not all) jurors on their own while they were still in the courthouse, without approval of the Court or notice to the Commission.  And, while it is unknown what precise questions were asked to those jurors, it is clear from their responses that Sargent's legal team went far beyond the single question whether the verdict was unanimous.  Instead, they solicited information regarding the substance of internal jury

---

[1] Separate and apart from controlling First Circuit law and the express instruction of this Court, the Massachusetts Rules of Professional Conduct impose an independent bar on contacting jurors post-verdict without notice to counsel and/or Court supervision.  Sargent's legal team violated those rules as well, and as described above, the Court should not allow them to leverage such conduct into a new trial.  *See* Local Rule 83.6.1 (incorporating by reference the Massachusetts Rules of Professional Conduct); Massachusetts Rule of Professional Conduct 3.5 (prohibiting communications with a juror after discharge of the jury if "(1) the communication is prohibited by law or court order; . . . or (4) the communication is initiated by the lawyer without the notice required by law.") and Comment 3A (describing the required notice to opposing parties before contact may be initiated).

deliberations.  Then, knowing that his legal team already had spoken with some of the jurors, Sargent opposed the Commission's motion to recall the jury to conduct a jury poll.  Sargent's counsel, having discussed the verdict and the deliberations with at least five of these jurors, then filed his motion for a new trial and the supporting affidavit on the public docket, with both documents purporting to summarize those discussions.  Dkt No. 241.  This public filing predictably generated press coverage in which reports of multiple juror statements about the verdict and the jury's deliberations were further disseminated, along with the entirety of Sargent's motion and Ms. Eskandar's affidavit in support of it.  *See* https://www.law360.com/articles/1481668/atty-says-failure-to-poll-jury-in-sec-suit-warrants-new-trial (last accessed April 18, 2022).

It was Sargent counsel's *own* violation of law and disregard of this Court's explicit admonition that created the conditions which he now points to as precluding any remedy other than a new trial.  Yet, incredibly, Sargent now complains that the jury could not have been recalled and polled (and cannot now be recalled and polled) because the jury has been "permitted to review media coverage concerning the verdict and to discuss the factors and their opinions with others."  *See* Dkt No. 243 at 4 ("Under these circumstances, the jury, if recalled, could not accurately be polled.")

The First Circuit has remarked in a different, but instructive context:  "In our view, when a trial judge announces a proposed course of action which litigants believe to be erroneous, the parties detrimentally affected must act expeditiously to call the error to the judge's attention or to cure the defect, not lurk in the bushes waiting to ask for another trial when their litigatory milk curdles."  *Reilly v. United States*, 863 F.2d 149, 160 (1st Cir. 1988).

Here, Sargent apparently believes that the Court's denial of its request to poll the jury was erroneous.  Rather than address that perceived error before the jury dispersed, Sargent took

12

unsanctioned actions that tainted the ability to recall and poll the jury and, if there were any suggestion of lack of unanimity, to continue deliberations.

V.     The Record Supports a Finding of Unanimity.

As the First Circuit has explained, "[i]n the context of failure to poll the jury, we think that carrying this burden [to show that the error was not harmless] requires, at the very least, some showing that the verdict was rendered under circumstances indicating a possible lack of unanimity of assent." *Ira Green, Inc.*, 775 F.3d at 27; *see Audette v. Isaksen Fishing Corp.*, 789 F.2d 956, 960 (1st Cir. 1986) (upholding jury verdict even though jurors were not polled individually whether the verdict was correct because "[t]he facts and circumstances strongly indicate that the verdict was fully concurred in by all jurors"); *Smego v. Payne*, 854 F.3d 387, 397 (7th Cir. 2017) (explaining that even if right to poll jury was not waived, district court's failure to poll jury was harmless error where the facts showed no signs of jury doubt or dissent); *see also Wiseman*, 295 Conn. at 120-21 (noting, when finding harmless error, "that there is no evidence in the record indicative of any harm to the plaintiff resulting from the trial court's failure to conduct a poll of the jury because there is no evidence suggesting that the jury was in any way divided.  The jury did not send the trial judge any notes indicating a lack of agreement . . . [and] the jury required only three hours of deliberation, which suggests that the deliberations were focused and harmonious").

There is, in the record properly before the Court, no indication of any lack of unanimity. The Court instructed the jury that its verdict had to be unanimous; the jury returned a unanimous verdict within approximately five hours after a two-week trial; none of the jury's questions suggested any disagreement amongst them; the jury, at no point, indicated that they were deadlocked; and the Court expressly asked the entire jury if they agreed with the verdict and all of them responded affirmatively without any indication to the contrary, (April 4, 2022 Tr. at 9).

Under such circumstances, "the minor matter of failing to poll the jury when it is clear that the verdict has received the assent of all the jurors cannot be adjudged a nullity, but must instead be regarded as simply an error" that is harmless. *Humphries*, 174 U.S. at 195.

VI. <u>The Content of the Eskandar Affidavit is Incompetent Evidence and Should be Stricken Under Fed. R. Civ. P. 606.</u>

Federal Rule of Evidence 606 provides that "during an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. *The court may not receive a juror's affidavit or evidence of a juror's statement on these matters*." (emphasis added). None of the exceptions to this Rule (extraneous prejudicial information, outside influence, or a mistake in entering the verdict) apply here. *See e.g.*, *Connolly*, 341 F.3d at 34 ("Federal Rule of Evidence 606(b) codifies the near-universal and firmly established common-law rule that prohibits the admission of juror testimony to impeach a jury verdict." (citation and internal quotation marks omitted)); *United States v. Sampson*, 332 F. Supp. 2d 325, 328 (D. Mass. 2004) ("Rule 606(b) has consistently been used to bar testimony when [it is alleged that] the jury misunderstood [the] instructions." (collecting cases) (brackets in original)).

Even in the absence of Rule 606, the second-hand, summary accounts of Sargent's unlawful contacts with jurors are both incompetent and inadmissible evidence of any prejudice. For example, Sargent claims that a juror stated "in substance" that the verdict did not go the way he wanted it to go, and contends, on this basis, that this must mean that the verdict was not unanimous. Dkt No. 241 at 3. Sargent ignores the obvious alternative: that the juror obeyed his oath to follow the law and rendered the correct verdict despite personal feelings to the contrary. This is precisely what the Court asks every juror to do—set aside personal feelings, assess the evidence, and apply the law as instructed.

Accordingly, Sargent's efforts to manufacturer prejudice and sow doubt about a clearly unanimous verdict must be rejected, and the affidavit should be stricken from the record.

VII. The Verdict Form Was Not Defective, and Sargent Failed to Timely Object or Establish Plain Error.

In addition to the foregoing, Sargent now argues, *for the first time*, that the verdict form was "fatally defective," Dkt No. 264 at 1 & 3, because of an incomplete sentence in the first question:  "Did the Commission prove that Henry Sargent engaged in fraudulent conduct (a deceptive scheme, untrue statement or material fact or material omission, and / or a fraudulent act, practice or course of business) with either intent or recklessness in violation of the Securities?"  Dkt No. 256 at 1.

    a. The Verdict Form Was Not Defective.

As an initial matter, Sargent's argument is meritless.  The verdict form is not fatally defective or "incomplete, vague, ambiguous, and contrary to law." Dkt No. 264 at 3.  Sargent advances this argument by suggesting that Question 1 could not have referred to the Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder because the short-form cite to this act is traditionally the "Exchange Act," and that phrase is not included in the question.  But, Sargent ignores an obvious, and simpler, explanation.

Sargent was charged with violations of Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Sections 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act").  Because the elements of an Exchange Act Section 10(b) violation and a Securities Act Section 17(a) violation in this case operated similarly, the Court combined those claims into Question 1.  This logical conclusion is further supported by the fact that Questions 2 and 3 concern Sections 17(a)(2) and 17(a)(3) of the Securities Act separately; meaning, clearly, the Court combined Section 10(b) and 17(a)(1) into one question.  Therefore, the proper way to read Question 1 is to insert the word "laws" after "Securities."  Those "Securities laws" are the Securities Act *and* the

15

Exchange Act, as the Court carefully instructed the jury. At its core, therefore, Sargent complains (quite literally) about form, not substance. And, as to the substance, Sargent notably does not argue that Question 1 improperly reflects the elements of the Exchange Act 10(b) *and* the Securities Act 17(a)(1) offenses. Presumably, because any such argument would be frivolous.

Even if the missing phrase should say: "Securities [Act and Exchange Act]" (instead of "Securities [laws]") the effect of the typographical omission is still meaningless. The jury was clearly instructed on the elements of Exchange Act Section 10(b) and Securities Act Section 17(a).[2] Sargent's arguments presume that the jury read the verdict form in isolation and somehow ignored the instructions the Court gave before, during, and after the trial. Sargent's argument should be rejected, as "it is well established that verdicts must be construed in light of the totality of the surrounding circumstances, including the court's instructions." *Putnam Res. v. Pateman*, 958 F.2d 448, 455 (1st Cir. 1992); *see also Velez v. City of New York*, No. 04-Cv-1775 ENV MDG, 2012 WL 1237646, at *5 (E.D.N.Y Apr. 12, 2012), aff'd 730 F3d 128 (2d Cir. 2013) (plaintiff challenges to the Court's use of the term "knowledge" on the verdict sheet was "spurious" when considering the Court's jury instructions on the issue); *cf. Scarfo v. Cabletron Sys, Inc.*, 54 F.3d 931, 950 (1st Cir. 1995) (finding that although the verdict form did not specifically address a certain issue, the question on the verdict form could be reasonably construed by the jury to ask about that issue, particularly when considered "together with the instructions"); *United States v. Poirier*, 321 F.3d 1024, 1032 (11th Cir. 2003), opinion corrected, No. 01-159898, 2003 WL 21211926 (11th Cir. April 1, 2003) ("We do not focus on any single sentence in the jury instructions because if the instructions taken together, properly express the

---

[2] The parties do not yet have access to the transcript from April 1, 2022, which would reflect the Court's charge and any sidebar conversations thereafter.

16

law applicable to the case, no reversible error has occurred, even if an isolated clause may be inaccurate, ambiguous, incomplete, or otherwise subject to criticism" (internal quotations and citation omitted)).

For the foregoing reasons, the notion that the verdict form "materially misled" the jury belies common sense when considering the totality of the circumstances. Indeed, not a single jury question sought explanation or clarification as to Question 1; plainly the jury had no difficulty grasping the obvious import of the question.

   b. <u>Sargent Failed to Timely Object and Fails to Establish Clear Error.</u>

In any event, Sargent never objected to the typographical omission he now claims rendered the verdict form defective.[3] Sargent's counsel are experienced defense attorneys, and his team had this form for several days before this Court provided it to the jury. If counsel believed the verdict form was incomplete and materially misleading because of the purported typographical omission, they had ample opportunity to raise the issue in a timely fashion. They did not. As a result, Sargent has forfeited his right to object to the verdict form.

Where, as here, a party has failed to timely present an issue to the district court, that issue is reviewed for plain error. *See Rooney v. Sprague Energy Corp.*, 554 F. Supp. 2d 39, 44 (D. Me. 2008) ("The time to object to the verdict form is before, not after, the verdict."); *see also United States v. Rodriguez*, 311 F.3d 435, 437 (1st Cir. 2002) (forfeiture occurs when "a party fails to make a timely assertion of a right"). Plain-error review requires Sargent to show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's

---

[3] To the extent he is now arguing that his general objection to the Court's decision not to use the verdict form he drafted instead of the Court's version sufficiently preserved any objection to the verdict as delivered, the law is to the contrary. Courts of appeal consistently have recognized that an issue is adequately raised before a district court only if it is made with sufficient clarity and specificity so that the district court may have an opportunity to consider and rule on the issue presented; vague, perfunctory objections such as the one Sargent raised before this Court are insufficient to preserve an issue for appeal. *See United States v. Millan-Machuca*, 991 F.3d 7, 29 (1st Cir. 2021) ("Vague statement does not preserve an issue for review.").

substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Padilla*, 415 F.3d 211, 218 (1st Cir. 2005) (quoting *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001)). There was no plain error here.

As explained above, the typographical omission at issue here does not rise to level of a "legal error" in the context of the plain-error doctrine. Moreover, even if the verdict slip erratum could plausibly be construed as a legal error, Sargent cannot credibly argue that it was so "clear or obvious" as to warrant overturning a duly-returned verdict.

Nor could Sargent satisfy the third and fourth prongs of the plain error standard. There is nothing to suggest that Sargent's substantial rights have been impinged upon. As for the "integrity[] or public reputation of judicial proceedings," the balance tips sharply *against* Sargent. The Court should not permit a party to parlay its violation of the settled legal and ethical standards in this Circuit—not to mention its violation of this Court's explicit admonition—into such a significant windfall.

VIII.   Conclusion

For the foregoing reasons, Sargent's motion for a new trial should be denied.

Dated:  April 18, 2022

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its Attorneys,

/s/ David J. D'Addio
Eric. A. Forni (Mass. Bar No. 669685)
David J. D'Addio (Mass. Bar No. 665790)
Jonathan R. Allen (Mass. Bar No. 680729)
Boston Regional Office
33 Arch Street
Boston, MA  02110

## Certification Pursuant to Local Rule 7.1

Counsel for the Commission conferred with counsel for Sargent regarding the Commission's motion to strike and asked counsel to withdraw Sargent's motion for a new trial based on the improper conduct described above. Counsel declined to withdraw its motion.

/s/ David J. D'Addio
David J. D'Addio

## Certificate of Service

I, David J. D'Addio, certify that on April 18, 2022, I filed the foregoing motion electronically with the Court. The filing will be sent to the registered participants as identified on the Notice of Electronic Filing and may also be accessed through the Court's ECF system.

/s/ David J. D'Addio
David J. D'Addio